## SIMPSON v. UNITED STATES.

APPEAL FROM THE COURT OF CLAIMS.

No. 51.   Argued October 19, 20, 1898. — Decided January 3, 1899.

The plaintiffs contracted with the United States to construct a dry dock at the Brooklyn Navy Yard according to plans and specifications, and to be built upon a site that was available. No provision was made in regard to quicksands should they come upon such in making the foundations. The main features of the contract are stated in detail in the statement of the case below. In executing the contract the contractors came upon shifting quicksands, by reason of which the work was made more difficult, and was much increased; and being unable to complete the work within the time specified in the contract, they asked for an extension, which was granted. On completion a settlement was had, all the money remaining due under the contract, and some that was due for extra work, was paid. It was not until about three years later that the claim for compensation for the extra labor and materials made necessary by the quicksand was made; and, when it was refused, this action to recover it was brought in the Court of Claims, and there decided adversely to the claimants. *Held*, That the contract imposed upon the contractors the obligation to construct the dock according to the specifications within a designated time, for an agreed price, upon a site to be selected by the United States, and contained no statement, or agreement or even intimation that any warranty, express or implied, in favor of the contractor was entered into by the United States concerning the character of the underlying soil; and that the judgment of the court below should be affirmed.

THIS appeal presents for review the action of the lower court rejecting a claim of the appellants.   31 C. Cl. 217.

The essential facts as found by the court below are summarized as follows: Pursuant to an act of Congress appropriating a stated sum for building two "timber dry docks to be located at such navy yards as the Secretary of the Navy may indicate," act of March 3, 1887, c. 390, 24 Stat. 580, 584, the Navy Department on April 19, 1887, advertised for proposals for the building of two dry docks to be located, one at the Brooklyn and the other at the Norfolk Navy Yard. The advertisement, whilst pointing out the general nature of the structures and their dimensions, contained no detailed plan of

the contemplated work, but announced that " dry dock build-
ers are invited to submit plans and specifications with pro-
posals for the entire construction and their completion in all
respects," and, moreover, it was said " bidders will make their
plans and specifications full and clear, describing the kinds and
qualities of the materials proposed to be used." Besides, the
advertisement stated that " for information in regard to the
location and site of the docks bidders are referred to the com-
mandants of the Brooklyn and Norfolk Navy Yards." On
May the 23d, pending the publication, the Navy Department
addressed to the commandant of the Brooklyn Navy Yard the
following letter :

" To enable the dry dock builders who may apply at the
yard under your command for information concerning the pro-
posed new timber dry dock, particularly regarding the foun-
dation of the site selected for the dock, I am instructed by
the chief of the bureau to request you to direct the civil
engineer of the yard to have the necessary borings made at
once with a view of ascertaining the nature of the soil to be
excavated for the pit or basin of the dock, as well as to what
depth, if any, below the line of water mark it will be necessary
to have the piling driven to secure a proper foundation for
the structure."

Conforming to these instructions, Mr. Asserson, a civil en-
gineer attached to the Navy Department, made an examina-
tion of the soil, making borings to a depth of from thirty-
nine to forty-six feet at a distance of fifty feet along a certain
length in the middle of a portion of the ground of the navy
yard. The result of these borings was delineated on a profile
plan purporting to show the character of the underlying soil.
It may be conceded that this plan indicated that the soil at
the point referred to was stable and contained no quicksand.
Simpson & Co., who were experienced dock builders, applied
for information as to the proposed site, and a copy of the
plan was handed to the firm. Simpson & Co. never knew of
the above letter until after this suit was brought, and they did
not intimate to any one that the bid which they proposed to
submit for doing the work was to be conditioned on the exist-

ence in the soil of the site to be selected of the characteristics indicated by the profile plan. It is true, however, that Simpson & Co. in making up their estimate and in preparing their specifications took into view the presumed condition of the soil, and that the amount of their bid was made up upon the assumption that the soil underlying the dock would prove to be like that indicated by the plan.

In June, 1887, Simpson & Co. bid for the construction of the docks. The first two sentences of their proposal were as follows:

"The undersigned, J. E. Simpson & Co., contractors and builders of Simpson's patent timber dry docks, of the city of New York, in the State of New York, hereby offer to furnish, under your advertisement, dated April 19, 1887, and subject to all the requirements of the same, and of the specifications, instructions and plans to which it refers, two timber dry docks of like dimensions, to be built in accordance with plans and specifications herewith submitted. One of said dry docks to be located at the United States navy yard, Brooklyn, in the port of New York, and the other at the United States navy yard, Portsmouth, in the port of Norfolk, Virginia, upon available sites to be provided by the Government, for the sum of one million and sixty-one thousand six hundred ($1,061,-600) dollars, United States currency."

The price asked for the two docks was very near the sum authorized by Congress to be expended for the purpose.

The specifications referred to were prepared by the firm, and contained the following recital:

"Location. — These dry docks shall be located as follows: One at the United States navy yard, Brooklyn, in the port of New York, and the other at the United States navy yard, Portsmouth, in the port of Norfolk, Virginia, upon available sites to be provided by the Government. The length of each dry dock, respectively, shall be five hundred (500) feet inside of head to outer gate sill."

Such other portions of the specifications as are material to be noticed are contained in the subdivision headed "General Construction," and are as follows:

"Piles. — All foundation, brace and cross-cap piles shall be of sound spruce or pine, not less than twelve inches diameter at butt and six inches at top, and of such length as may be required for the purpose, and well driven to a firm bearing.

"Sheet piling for cut-offs shall be of sound spruce, pine or other suitable material, four inches and five inches in thickness, as shown on plans, dressed to a uniform thickness, grooved and fitted with white pine tongues, driven close and to such depths as may be found necessary to make good work, and closely fitted to square piles at intersections.

*  *  *  *  *

"Should the character of the bottom be found such as to warrant a modification of the pile system of floor construction, a concrete bed of not less than six feet in thickness may be substituted for the foundation piles, and the floor stringers and cross timbers imbedded therein and firmly secured thereto with iron bolts and anchors."

The bid was accepted, and a written contract was executed. In this contract recital was made of the advertisement for proposals, the making of the bid with accompanying specifications and the acceptance thereof, and these documents thus referred to were annexed and made a part of the contract.

The contract contained in its first clause the following:

"The contractors will, within twenty days after they shall have been placed in possession and occupancy of the site by the party of the second part, which possession and occupancy of the said site during the period of construction, and until the completion and delivery of the work hereinafter mentioned, shall be secured to the contractors by the party of the second part, commence, and within twenty-four calendar months from such date, construct and complete, ready to receive vessels, a timber dry dock, to be located at such place on the water line of the navy yard, Brooklyn, New York, as shall be designated by the party of the second part; and will, at their own risk and expense, furnish and provide all labor, material, tools, implements and appliances of every descrip tion — all of which shall be of the best kind and quality adapted for the work as described in the specifications — nec-

essary or requisite in and about the construction of said dry dock."

The seventh clause of the contract is stated in the margin.[1]

In addition, penalties were stipulated for delay in the performance of the work, and a discretion was vested in the Secretary of the Navy to allow an extension of time for any failure to complete the dock within the contract period.

The work was to be paid for in instalments, upon proper estimate, as it progressed, and ten per cent was to be retained by the Government until its final completion.

The construction was commenced in November, 1887, and

---

[1] The construction of the said dry dock and its accessories and appurtenances herein contracted for shall conform in all respects to and with the plans and specifications aforesaid, which plans and specifications are hereunto annexed, and shall be deemed and taken as forming a part of this contract, with the like operation and effect as if the same were incorporated herein. No omission in the plans or specifications of any detail, object or provision necessary to carry this contract into full and complete effect, in accordance with the true intent and meaning hereof, shall operate to the disadvantage of the United States, but the same shall be satisfactorily supplied, performed and observed by the contractors, and all claims for extra compensation by reason of, or for or on account of, such extra performance, are hereby and in consideration of the premises, expressly waived; and it is hereby further provided, and this contract is upon the express condition, that the said plans and specifications shall not be changed in any respect when the cost of such change shall exceed five hundred dollars, except upon the written order of the Secretary or acting Secretary of the Navy; and if changes are thus made the actual cost thereof, and the damage caused thereby, shall be ascertained, estimated and determined by a board of naval officers appointed by the Secretary of the Navy, and the contractors shall be bound by the determination of said board, or a majority thereof, as to the amount of increased or diminished compensation, which they (the contractors) shall be entitled to receive, if any, in consequence of such change or changes; it being further expressly understood and agreed that such working plans and drawings, and such additional detailed plans and specifications as may be necessary, shall be furnished by and at the expense of the contractors, subject to the approval of the chief of the Bureau of Yards and Docks, and that if during the prosecution of the work it shall be found advantageous or necessary to make any change or modification in the aforesaid plans and specifications, such change or modification must be agreed upon in writing by the contractors and by the officer in charge of the work, the agreement to set forth fully the reasons for such change and the nature thereof, and to be subject to the approval of the party of the second part.

after considerable labor had been expended and material used, "about August 31, 1888, it first became apparent that a portion of the dry dock structure had sunk and moved inward towards the excavation, and had thereby sustained damage, and that this damage was caused by encountering a stratum of water-bourne sand, in the excavation, which flowed from beneath and undermined the banks forming the side of the dock excavation." Thereupon it was ascertained that the "sand stratum hereinbefore described underlay the entire area of the site of the dock, and beginning at a depth of from twenty-six to thirty feet below the grade of the side extended to a depth of seventy feet below the same." . . . "Between August, 1888, and October, 1889, portions of the dry dock structure completed by the plaintiffs during that period continued to settle and move inward towards the excavation." . . . "This was caused by the presence of the said sand stratum which continued to undermine the side of the dry dock excavation; hence, portions of the dry dock structures were destroyed or greatly damaged." . . . "During the period aforesaid the sand flowed into the excavation made for the dry dock, delaying the completion thereof, and increased the cost of the dock. The character of the soil underlying said site was not as it appeared in the profile plan in the report of the said Asserson, in so far as the said sand stratum is concerned, and both parties were surprised in encountering the difficulty and expense caused by the presence of the said sand stratum. After the discovery of the said sand stratum, as aforesaid, Commodore Harmony, Chief of the Bureau of Yards and Docks, inspected the work upon the site of the dry dock, and directed the plaintiffs to complete the dock. By reason of the presence of the said stratum of sand and the difficulties caused thereby the completion of the dock was delayed seven months."

Simpson & Co. in the meanwhile addressed a letter to the Navy Department, stating that, owing to "circumstances beyond our control," the existence of the quicksand, they had been unable to complete the dock within the time fixed by the contract, and requesting an extension of four months. This request was granted.

· "During the entire period in which the plaintiffs were engaged in the construction of the work they did not at any time give notice of any claim, or claim or demand any sum of money on account of any extra work or materials furnished by them in or about the construction of the said dry dock; nor was any officer or agent of the Government apprised of such a claim until the receipt of the letter of Messrs. Goodrich, Deady & Goodrich, attorneys for the assignees of the plaintiffs, dated April 11, 1893."

As the work progressed estimates thereof were made as required by the contract, and the amount, less the ten per centum reserved, was regularly paid to the contractors. Moreover, additional piling being required, a supplementary estimate thereof was made, the price for the same fixed, and the amount was paid to the contractors.

The dock was completed May, 1890, and a board was appointed to inspect it, and upon a favorable report the dock was finally received by the United States, and a claim for ten per cent, which had been retained on the amount of the whole work was presented by the contractors, was audited and paid, and a full and final receipt was given on June 17, 1890. The relations between the contracting parties in reference to the dock then terminated, and no question was raised between them as to any extra claim or allowance until nearly three years after the final settlement, that is, on April 11, 1893, when the attorneys of the Simpson Dry Dock Company, as assignees of the claim of J. E. Simpson & Co., addressed a letter to the Secretary of the Navy, claiming for extra services rendered and material furnished in the construction of the dry dock. This claim was based upon the theory that the site of the dry dock was not "available, owing to the unfavorable and unstable character of the soil," and hence that the Government was liable to the contractors in the sum of $174,322. This demand not having been complied with, the present suit was brought, the claim being for a much larger sum than that stated in the letter of the attorneys, and being made on behalf of the members of the firm of J. E. Simpson & Co., as owners thereof.

*Mr. James H. Hayden* for appellants. *Mr. Joseph K. Mc-Cammon* was on his brief.

*Mr. George Hines Gorman* for appellees. *Mr. Assistant Attorney General Pradt* was on his brief.

MR. JUSTICE WHITE, after making the foregoing statement, delivered the opinion of the court.

Considering the facts above stated, it is at once apparent that the claim against the United States can only be allowed upon the theory that it is sustained by the written contract, since if it be not thereby sanctioned it is devoid of legal foundation. The rule by which parties to a written contract are bound by its terms, and which holds that they cannot be heard to vary by parol its express and unambiguous stipulations, or impair the obligations which the contract engenders by reference to the negotiations which preceded the making of the contract, or by urging that the pecuniary result which the contract has produced has not come up to the expectations of one or both of the parties, is too elementary to require anything but statement. The principle was clearly announced in *Brawley* v. *United States*, 96 U. S. 168, 173, where it was said:

"All this is irrelevant matter. The written contract merged all previous negotiations, and is presumed, in law, to express the final understanding of the parties. If the contract did not express the true agreement, it was the claimant's folly to have signed it. The court cannot be governed by any such outside considerations. Previous and contemporary transactions and facts may be very properly taken into consideration to ascertain the subject-matter of a contract, and the sense in which the parties may have used particular terms, but not to alter or modify the plain language which they have used."

Before measuring the claim by the contract, it is essential to clearly define the exact predicate upon which the demand necessarily rests. Reducing all the contentions of the claim-

ant to their ultimate conception, they amount simply to the proposition that the United States by the written contract guaranteed the nature of the soil under the site of the proposed dock, and assumed the entire burden which might arise in case it should be ascertained, during the progress of constructing the dock, that the soil under the selected site differed to the detriment of the contractors from that delineated upon the profile plan which had been made by an officer of the United States. Considering the contract itself, it is clear that there is nothing in its terms which supports, even by remote implication, the premise upon which the claimants must rest their hope of recovery. The contract imposed upon the contractors the obligation to construct the dock according to the specifications within a designated time for an agreed price upon a site to be selected by the United States. We look in vain for any statement or agreement or even intimation that any warranty, express or implied, in favor of the contractors was entered into concerning the character of the underlying soil. The only word which it is claimed supports the contention that a warranty was undertaken by the United States as to the condition of the soil is the statement, found in the opening portions of the specifications, that the dock was to be built in the navy yard upon a site which was "available," and great stress was laid in the argument at bar upon this word. But the word "available" intrinsically has no such meaning as that sought to be given it. It certainly cannot be said that the site selected for the dock was not available for the purpose, since one has been actually erected thereon. It is conceded in argument that the word "available" has not naturally the meaning which must be attributed to it in order to support the contention that there was a warranty as to the condition of the soil. But it is said the word should be construed as having such signification, because bidders were referred to the commandants of the navy yards for information as to the sites of the docks, and the plan showing the result of the examination made upon a portion of the yard was submitted to them. In other words, whilst admitting the rule that the contract is the law of the case, and

that the rights and obligations of the parties are to be alone determined from its context, the argument invokes a departure from that rule, and asks that the contract be so construed as to create a right in favor of one of the parties in conflict with the natural significance of the language of the contract, because of antecedent negotiations which took place between the parties.

Aside from the contradiction which this contention involves, the meaning now claimed for the word "available" cannot be adopted without departing from the intention of the parties as manifested by the terms of the contract, and the documents forming part of it, and such meaning cannot moreover be sanctioned without doing violence to the context of the contract. The advertisement for bids was made in April, 1887. The bid and specifications which accompanied it were drawn by the firm, and were submitted in June, 1887. The advertisement to which they were an answer called for a full and explicit statement of what was proposed to be done by the contractors and what were the requirements upon which they expected to rely. The contractors were experienced and competent dock builders. If it had been their intention to only undertake to build the dock for the price stipulated, provided a guarantee was afforded them by the United States that the soil upon which the dock was to be constructed was to be of a particular nature conforming to a plan then existing, a purpose so important, so vital, would necessarily have found direct and positive expression in the bid and specifications, and would not have been left to be evolved by a forced and latitudinarian construction of the word "available," used only in the nature of a recital in the specifications and not in the contract. The fact that the bidders knew that a test of the soil in the yard had been made, and drew the contract providing that the dock should be located on a site to be designated by the United States without any express stipulation that there was a warranty in their favor that the ground selected should be of a defined character, precludes the conception that the terms of the contract imposed such obligation on the Government in the absence of a full and clear expres-

sion to that effect, or at least an unavoidable implication. This is made clearer by other portions of the contract and specifications.

The seventh paragraph of the contract contained a stipulation that "the construction of the said dry dock and its accessories and appurtenances herein contracted for shall conform in all respects to and with the plans and specifications aforesaid." Now, the recital in the specifications as to an "available" site is only contained in the opening clause thereof, and naturally suggests only that it relates solely to some place in the yard which should be selected in the discretion of the Government suitable for the erection of a dry dock. So also in the specifications as to the materials to be furnished, which follow the recital as to the location of the dock, there is not contained a word implying that a particular piece of ground in the navy yard, having soil of a specially stable character, was to be the site on which the dock was to be placed. The contrary, however, is clearly implied from the provisions as to foundation and other piling which were to be used in supporting and enclosing the structure. The foundation, brace and cross-cap piles, it was stipulated, were to be "of such length as may be required for the purpose, and well driven to a firm bearing," while it was stipulated that the sheet piling should be "driven close and to such depth as may be found necessary to make good work;" and these provisions were followed by a clause reciting that "should the character of the bottom be found such as to warrant a modification of the pile system of floor construction, a concrete bed of not less than six feet in thickness may be substituted for the foundation piles."

Light is thrown upon the plain meaning of the contract by the conduct of the parties in the execution of the work. It is not pretended that, when the character of the subsoil was discovered, the slightest claim was preferred that this fact gave rise to an extra allowance. The fact is that the contractors proceeded with the work, obtained delay for its completion, made their final settlements and received their last payment without ever asserting that any of the rights which they now claim were vested in them. Without deciding that such con-

duct would be decisive if the claim was supported by the contract, it is nevertheless clear that it affords a just means of adding forceful significance to the unambiguous letter of the contract and the self-evident intention of the parties in entering into it.

*Judgment affirmed.*