GROTON BRIDGE & MANUFACTURING COMPANY *v.* ALABAMA & VICKSBURG RAILWAY COMPANY.*

1. CONTRACTS. *Specifications. Railroads. Bridge construction.*

Borings in the vicinity of piers for a railroad bridge to be erected under a contract based upon specifications and a diagram in profile showing such borings, submitted to bidders by a railway company, do not constitute a warranty in favor of the contractor that the different strata beneath the surface of the earth shown by each boring exist at the location of the nearest pier, and that logs beneath the surface, not indicated at any boring, will not be encountered at the location of the nearest pier in sinking it to grade, the plans only warranting that the borings truly represented what was found where they were made.

2. SAME. *Interpretation. Expert testimony.*

There being nothing in a contract beyond the comprehension of ordinary people, its construction is for the court, without the aid of expert engineers and bridge contractors as to the import of the borings as indicated on the diagram.

*Judge Calhoun, having been of counsel in this case, recused himself and J. A. P. Campbell, Esq., was appointed special judge and acted in his stead.

FROM the chancery court, first district, of Hinds county.

HON. HENRY C. CONN, Chancellor.

The Groton Bridge, etc., Co., appellant, was complainant, and the railway company, appellee, defendant, in the court below.

The opinion states the facts of the case.

*Green & Green,* for appellant.

What is the effect of the borings showing the precise number of feet of sand, gravelly clay, fine white sand, blue clay, and stiff blue clay at their relative depths on the drawing? It will be noted that there are three borings on the plat, one on each bank of the river near piers 2 and 3, and one near pier 4, not in the contract. The intent of the plat was clearly to furnish information to the bidder upon which to base the amount of his bid. The proposal did not require or suggest that bidders were to examine the *locus* themselves, but it purported to furnish an exact topographical and descriptive statement of the location and the work to be done. The answer admits that the borings were intended to show the probable nature of the soil underlying the river bed. Bidders were to take the data given and make a bid, and it was not intended that they should figure on blasting rock for so many feet when the boring near the pier showed sand. *County* v. *Harris,* 108 Ill., 158. In the case cited we find the following language: "We are not authorized to assume the furnishing of these plans and specifications, and writing these bids and proposals, were intended either to entrap the unwary or as an idle and useless ceremony, but one must, on the contrary, assume that they were intended in good faith, for the purpose of intelligently and *bona fide* making a contract for the construction of the foundation of the courthouse."

By paragraph 15 of the proposal it was provided as follows: "The drawings, with all figured dimensions and written explanations thereon with these specifications, are to be the basis of

the contract, and of equal force." The drawings are expressly made a part of the contract. Now the borings are part of the drawings, and the dimensions of them are figured, so much sand, etc., and they bear the "written explanations thereon" of "sand," "clay," etc. These elements are to be the basis of the contract; that is to say, the basis of the contract proposed to bidders was to go through a certain number of feet of sand, at a certain distance from the surface, a certain number of white sand, clay, etc. In other words, the boring gave a sample of the contemplated work as a basis for bidding, just as a sample from one bale of cotton might be offered as a basis for a bid on a hundred bales. The boring on the east side of the river applied to pier 3 on that side; the boring on the west side was a sample of the strata on that side of the river, as shown by the testimony of the experts. The borings are thus made a part of the contract, and are a warranty that the contractor in making his bid may assume as true that the substances named, in the quantities named, and at the depths stated, would have to be gone through, and that any excess would be adjusted on force account.

It is not necessary to use the word warrant, nor any special words; "but any affirmation or assurance of a fact during the treaty of sale on the part of the seller, upon which the buyer is intended to, and actually does, rely in making his purchase, is sufficient to constitute a warranty." Biddle on Warranties, sec. 35; *Alts* v. *Alderson,* 10 Smed & M., 480. Any uncertainty is construed against the proponent who prepares the proposal, and in favor of the invited acceptor. *Gillett* v. *Bank,* 160 N. Y., 554. The better rule is that the positive affirmation of a material fact as a fact, intended to be relied on as such, and which is so relied on, constitutes as matter in law a warranty, whether the vendor mentally intended to warrant or not; his intention is immaterial. Benjamin on Sales (6th ed.), 625, citing *Reed* v. *Hastings,* 61 Ill., 266; *Kenner* v. *Harding,* 85 Ill., 268; *Hawkins* v. *Pemberton,* 51 N. Y., 189; *Common-*

*wealth* v. *Jackson,* 132 Mass., 16; *McClintock,* 87 Ky., 167; *Ormsbee* v. *Budd,* 72 Ia., 167. The intent will be gathered from the instrument regardless of the real intention of the party. *Dunbar* v. *Aldrich,* 79 Miss., 698, s.c., 31 So. Rep., 341; *Marks* v. *Bradley,* 69 Miss., 11.

In *Delafield* v. *Village,* 77 N. Y., 124-128, this was at the bottom of the specifications: "Note.—The vitrified pipe line is mostly and the tunnels are entirely to be in soft shale rock." Bids were invited, and the plans and specifications were made parts of the contract by reference. At the time of the acceptance of the bid the exact route of the pipe line had not been located. The contractor relied in making his bid on the representation as to the character of the excavations; held that it was a warranty of the character of the soil, and that the city was liable for the extra cost of excavating harder material. The same principle is recognized in *Simpson* v. *United States,* 172 U. S., 372; *Atlantic Dredging Co.* v. *United States,* 35 Court of Claims, 463. We say, therefore, there was, as matter of law, an express warranty, the breach of which was not denied.

The testimony of the engineers and bridge contractors show that the borings, in the language of their professions, mean that the bidder is to base his figures upon going through the character of material shown on the drawing, and for the depth indicated, and that should logs or other obstructions, or a different character or amount of material be encountered, the cost of all extra work occasioned thereby should be adjusted on force account. As contrasted with the testimony to the contrary, the preponderance of the evidence sustains this position.

The chancellor did not discredit any of these witnesses, but held that the effort of the appellant was to prove a custom, and that in view of this conflict in the evidence it could not be said to have been shown that the custom existed. This was a misconception of the object of appellant in introducing the expert testimony, which was not intended to prove a custom, but to

show by professional engineers, skilled in preparing and interpreting plans and specifications, what in the language of their profession these borings, in the absence of any express warranty, meant, and that they were to be taken to mean that the bidder could base his bid on the character, quantity, and relative depth of the material specified, and that in case any different material, involving additional labor, should be encountered, that extra pay by force account would be allowed. It was competent to interpret these plans and specifications in the absence of an express warranty as understood by engineers skilled in their profession. *Jones* v. *Finch,* 37 Miss., 461-469; 1 Greenleaf Evi. (16th ed.), par. 280.

*McWillie & Thompson,* for appellee.

The misrepresentations relied on by the appellant relate (1) to the presence of underground logs where the cylinders were to be located, and (2) to a somewhat different stratification of earthly materials at the points where the cylinders were to be located from that shown by the borings on the blue-print diagram.

It was not pretended that any representations were made by the defendant as to the above matters, unless they can be found in the specifications and blue-print submitted for bids, and the appellant has most earnestly labored, and still labors, to show that the borings shown on the blue-print constituted a warranty in favor of the appellant as the bidder securing the contract; that logs and other obstructions would not be encountered in sinking the cylinders, and that exactly the same stratification would be found where the cylinders were to be sunk that had been found and indicated on the blue-print where the borings were made. In support of this contention the appellant examined several witnesses, who testified, some that they were civil engineers and others that they were bridge contractors, and that in their opinion bidders would interpret the specifi-

cations and blue-print according to the appellant's theory. This testimony, which is wholly inadmissible for the interpretation of a contract expressed in the plainest terms, is much weakened by the cross-examination of the several witnesses, and is also in conflict with the clear, satisfactory, and reasonable testimony in behalf of the defendant.

There is, however, apart from this conflicting testimony, undisputed evidence of facts which make the appellant's contention wholly unreasonable.

The specifications, as the court will see, expressed nothing as to the presence or absence of sunken logs or the character of the stratification, and they negative the idea that the blue-print diagram was intended to do so by referring to it as being "a general plan showing the size, location, and height of the proposed piers" and the "elevations" to which the cylinders were "to be sunk."

That the appellee did not intend to show by the blue-print the presence or absence of logs and the exact stratification at the points where the cylinders were to be sunk, is perfectly plain. The appellant's argument to the contrary of this rests on the facts that the borings as indicated on the blue-print did not show that any sunken logs had been encountered at the points where they were made, and did show the stratification of earthy matter through which they passed at those points. Several important circumstances unite to render utterly fallacious the conclusion deduced by the appellant from these facts.

The borings were not made at the places where the cylinders were to be sunk, and were made with a $1\frac{1}{2}$ or 2-inch auger, while the cylinders at pier 1 were to be 7 feet in diameter, and the cylinders at piers 2 and 3 were to be $7\frac{1}{2}$ feet in diameter. It would be idle to argue that a $1\frac{1}{2}$ or 2-inch auger might be sunk in one place without striking a sunken log, while a 7 or $7\frac{1}{2}$-foot cylinder might not be sunk in another place without doing so. Indeed, such a boring in the center of the space to be occupied by such a cylinder would afford no reliable inference

of the absence of logs within the same circumference which would retard the sinking of the cylinder, much less borings many feet distant.

The appellant's deduction from the showing made by the blue-print as to the strata through which the borings passed is equally inconsequential, the borings not having been made where the cylinders were to be sunk. Moreover, as the strata at the point of each boring varied somewhat from those at every other boring, the blue-print manifestly and affirmatively indicated a varying stratification, from which differences at points where no borings had been made might reasonably be expected. It will also be observed that none of the appellant's witnesses kept memoranda, or could state definitely and accurately the depth of the different strata through which the cylinders were sunk, while the memoranda made during the progress of the work by Mr. Dabney, assistant to the resident engineer, are absolutely reliable, and show that the stratification encountered in sinking each cylinder was about the same as that shown by the nearest boring. Pier 1 figures little in this discussion touching stratification, since the appellant was not required to sink that one to grade, and the testimony of Dabney and his memorandum book and the drawings therein, show that the north cylinder of pier 2 passed through 29 feet of sand, and 15 feet of blue clay, and the south cylinder of that pier passed through 24 feet of sand and 11½ feet of clay, while at pier 3, where both cylinders encountered the same material, they passed through 8 feet of yellow clay, 7 feet of sand, and 17 6-10 feet of blue clay. This is just about what the borings nearest these piers show respectively in the way of stratification, and the same thing can be said as to the stratification encountered at pier 1, if the consideration of that be material. Certainly there was no more difference between the stratification at the borings and that at the location of the piers than there was between the several stratifications at the borings.

The evidence shows that these borings were made some

months prior to the location of the piers and the preparation of the blue-print, and before the appellee had decided upon the nature of the substructure of the proposed bridge; that the appellee caused them to be made for its own information in a general way as to the foundation along the line of the location of said bridge, and that having such information as said borings afforded, its resident engineer put them on the blue-print to impart that information, but no more. Indeed, every one who observed with any degree of care would see that the showing of the borings could not have had the purpose or effect claimed by the appellant, not only for the reasons above stated, but because there were only four borings, and one of them, that near pier 4, which pier was not included in the specifications or contract, was not in the vicinity of any pier to be erected by the appellant, and also because there was no boring in the vicinity of pier 1, which was to be erected by the appellant, thus showing a boring where it could have no import with reference to appellant's theory, and not showing a boring where one might have had some import. Manifestly in such a case it would be absurd to say that the borings were intended to give, or operated to give, bidders anything more than the general information for which they were made by the appellee.

Argued orally by *Marcellus Green,* for the appellant, and by *T. A. McWillie,* for the appellee.

J. A. P. CAMPBELL, Special J., delivered the opinion of the court.

This is an action for damages for breach of a contract set forth in complainant's bill. No objection was made to the jurisdiction of the chancery court, as, doubtless, the defendant welcomed the call to respond to the demand before a chancellor, rather than a jury; and we call attention to this feature of the case, not to make any ruling upon it, but to exclude the con-

clusion that it is to be regarded as an authoritative precedent for maintaining the jurisdiction of chancery in such cases.

The facts are that the appellee, having purposed to construct a bridge over Pearl river at its crossing, to be supported by a substructure determined on, and to consist of piers composed of steel cylinders sunk to a certain depth, and filled with concrete, and united, braced, and capped as specified, had drawings made of the proposed substructure, and distributed them and "specifications" among those thought to be likely to bid for the work; and, among others, these were sent to the agent of appellant. The map of the proposed structure showed the intended substructure and superstructure, and the depth to which the cylinders were to be sunk. There were four piers, but the fourth was not included in the invitation for bids. Each pier was to consist of two cylinders placed 17 feet apart. The profile accompanying the specifications showed "borings" in the vicinity of piers Nos. 2, 3, and 4, at varying distances; that opposite No. 2 being 7 feet from it, and that opposite No. 3 being 28 feet from it. The distance between piers Nos. 1 and 2 was 103 feet 6 inches, and between Nos. 2 and 3 was 183 feet, as shown by the profile. The borings in the vicinity of piers Nos. 2, 3, and 4 showed as follows, viz.: Opposite No. 2, "sand," "fine white sand," "stiff blue clay;" opposite No. 3, "gravelly clay," "sand," "blue clay," "stiff blue clay;" opposite No. 4, "stiff yellow clay," "blue clay," "soft sandy blue clay," "stiff sandy blue clay"—all commencing at the surface of the earth, and ranging downward. The thickness of each substance was shown on the map. These borings were for the double purpose of ascertaining the proper depth for the cylinders, and the character of the formation of the earth where the borings were made, whereby to obtain an idea of the probable formation where the cylinders were to be sunk. The size of the borings was 1½ or 2 inches in diameter.

The appellant, acting on an estimate by its agent, M. S.

Hasie, to whom the plan and specifications had been sent, inviting a bid, offered to do the desired work for $9,790.70; and its bid was accepted, and a contract made between the parties in elaborate detail as to its various provisions. The bid and contract were made on the basis of the plan and specifications submitted by the appellee, and in reliance on their truly representing whatever they expressed, and the rights of the parties are to be determined in recognition of this fact. The contract was made February 10, 1898, and soon thereafter the appellant shipped to Jackson thirteen car loads of material and appliances for the work to be done. Delay occurred in getting these things to the river, and a claim for damages for that delay forms an item of this suit, and was allowed by the chancellor, whose decree was not appealed from by the appellee. The work was commenced and proceeded with until logs were encountered, which precluded further progress until new and different machinery for their removal was obtained. The resident engineer of appellee was applied to, and declined to do anything; and the superintendent and president of the appellee, respectively, were appealed to, and declined to interfere; the agent of the appellant claiming that the expense of removing the obstructions unexpectedly met with should be borne by the appellee, and the officers of the appellee denying the claim. The result of the dispute was the procurement of the requisite machinery and appliances for the work, and its ultimate completion, after many interruptions and hindrances by high water occurring several times, and yellow fever alarms, and quarantine restrictions, postponing the completion of the job until June, 1899; resulting in great loss to the appellant, which is sought to be recovered in this suit. Another claim of the appellant is that the working force in sinking the cylinders was interfered with by the resident engineer of the appellee, who was supervising the sinking of the piers, by his requiring the cylinders to be kept perpendicular, thereby preventing their being vibrated so as to facilitate

sinking; and by requiring the cylinders to be kept empty of water, whereby the difficulty of sinking was greatly increased. The allegation is that the engineers of the appellee were incompetent for the work. On the completion of the work a statement was made of the sum due appellant, and of payments made, and balance due of $4,213.60. It was certified by Mr. Stubbs, resident engineer of appellee, and approved by the superintendent; and the sum named was tendered to the appellant, with the requirement of a receipt in full, which was refused, and this suit brought. The decree is for the sum previously mentioned as allowed for the delay before the work was begun, and for the $4,213.60 admitted to be due, and interest, from which decree the complainant in the chancery court appeals.

That the contract proved to be an unfortunate one for the appellant, resulting in disappointment and great loss, is true; and the question is, who should bear it? The paramount question is the true interpretation of the contract as to the "borings." Did the appellee warrant the borings to show the character of the obstructions to the sinking of the cylinders? It certainly did warrant the borings to truly represent, with substantial accuracy, what was found where they were made, but it did not guaranty that the same conditions existed where the cylinders were to be sunk. It was a natural inference that the same general characteristics of the earth's composition would be found at the places for the cylinders, but it was mere inference, indulged in, no doubt, by both parties; but as nothing was said about this, and the contract is silent as to obstructions, and there is no specific reference in the profile or specifications to the composition of the earth or obstructions to be met in sinking the cylinders, it cannot be held that the appellee warranted anything more than that the borings were true—not that they could be relied on as to conditions elsewhere. A *fortiori* it cannot be held that they were a guaranty that logs would not be found to bar the progress of the cylinders. We have examined all the citations of the learned counsel for ap-

pellant, whose conspicuous industry affords a guaranty that all that are pertinent and accessible have been referred to. The three cases directly in point cited are *Delafield* v. *Village of Westfield*, 77 Hun., 124 (28 N. Y. Supp., 440); *Simpson* v. *United States*, 172 U. S., 372 (19 Sup. Ct., 222; 43 L. Ed., 482); and *Atlantic Dredging Co.* v. *United States*, 35 Ct. Cl., 463. We fully approve all these decisions, and regard that in 172 U. S., 19 Sup. Ct., 43 L. Ed., as exactly like this, and decisive of the question we are discussing, while the other two sustain and enforce our view.

In the case in 172 U. S., 19 Sup. Ct., 43 L. Ed., there were "borings" as here, and they were held to perform the office we ascribe to them. In the other cases there was what was justly held to be a specific guaranty, as to which there could not be any just dispute. We would decide each of those cases as they were decided. We are quite sure that the idea of the borings being a guaranty of the character of the strata of earth to be found at the places for the piers was an afterthought of Mr. Hasie, who, in making the estimate for a bid for the work, did not make any distinction between the different strata, and estimated for all one uniform price, although he understood from the borings on the profile that there were 5 and 9 feet of the hardest clay to be displaced by the cylinders, or 42 feet in all; there being six cylinders. Indeed, it may be justly doubted if the borings had much or any influence in estimating for the bid or in making the contract. It is certain that there is no specific reference to them in the specifications or contract, and it is doubtful if there is even a general reference to them.

We have disregarded entirely the testimony of the various engineers as to their understanding of the borings, and what they import. The interpretation of the contract and its basis is for the court, without the aid of experts, since there is nothing in them beyond the comprehension of plain people of ordinary understanding and acquirements; no ambiguous expressions, or terms of art, or trade, or science; nothing requir-

ing the help of engineers to determine the meaning of the contract.

We have failed to find in the record any just ground for complaint of the interference of engineers of the appellee with the work of sinking the cylinders, or any responsibility for the unfortunate delay in doing the job, which proved harder than expected. While complaint is made of the interference of the assistant engineer with the sinking of the cylinders, there is also vigorous complaint from the same source that the engineers would not do any thing. It seems to us that the bid of appellant was the result of overconfidence on the part of its agent as to his ability to execute the work. He shows that he regarded the cylinders as of metal too thin for so great a depth as they were to be sunk, and caused their being strengthened by some addition which he thought would secure safety; and at the time of his testifying, long since the work was done, he regarded it as extraordinary and almost miraculous that the sinking of the cylinders was finally accomplished, which shows that the estimate of cost was an improvident one, and that the real cause of the increased cost arose from the inherent difficulty of the situation. We find no basis for any charge against the appellee other than contained in the decree appealed from, and, in the view we have taken, it is unnecessary to discuss any other question.

*Affirmed.*