## ROSENBERG et al. v. UNITED STATES.*

Circuit Court of Appeals, Ninth Circuit.
April 1, 1929.

No. 5499.

*Rehearing denied May 27, 1929.

Brownstone & Goodman, Gavin McNab, Schmulowitz, Wyman, Aikins & Brune, Nat Schmulowitz, and Frederick T. Hyde, all of San Francisco, Cal., for appellants.

George J. Hatfield, U. S. Atty., and George M. Naus, Asst. U. S. Atty., both of San Francisco, Cal.

Before GILBERT and DIETRICH, Circuit Judges, and NORCROSS, District Judge.

NORCROSS, District Judge. From a judgment for defendant in an action for damages for breach of contract brought under section 24 of the Judicial Code (28 USCA § 41), plaintiffs appeal.

Plaintiffs' petition sets out three causes of action. The first alleges the making of a contract of date May 16, 1922, for the sale of 5,436 net tons of various classes of iron and steel at $14.55 per ton, and 1,240 gross tons of cast iron scrap at $10.75 per ton, to be delivered free at ship's tackle, Balboa, Canal Zone; that defendant failed and refused to deliver 217 net tons of said iron and steel, to plaintiffs' damage in the sum of $6,053.19. The second alleges payment to defendant by plaintiffs of the agreed price for 5,219 tons of iron and steel, and 1,240 gross tons of cast scrap iron, and that there was a shortage in delivery of 200⅕ tons of iron and steel, and 96,115 pounds of cast scrap iron, to plaintiffs' damage in the sum

of $3,429.45. The third cause of action is for an alleged shortage in delivery under a similar contract of date July 27, 1922, occasioning an overpayment of $906.11. Plaintiffs waive the sum of $388.76, and pray for judgment for $9,999, together with interest and costs.

Defendant by its answer admits the contract sued upon, but alleges in effect that it was made in pursuance of a circular letter, referred to therein, calling for bids for the material offered for sale by the Panama Canal, and that such letter was a part of the contract; that all material was delivered within the terms of the contract, and that no material was paid for which was not delivered.

The court found: "That under date of May 16, 1922, the Panama Canal entered into a contract with plaintiffs, whereby the plaintiffs agreed to purchase and the Panama Canal agreed to sell 5,219.76 net tons of surplus iron and steel at $14.55 per ton, and 1,240.55 tons of scrap iron at $10.75 per ton. That the said Panama Canal complied with the terms of the agreement. That plaintiffs performed the terms, conditions, and provisions of said contract on their part to be performed except," etc. (the exception being in minor matters not material to the question here involved). "That the allegations of paragraphs II, III, IV, V, and VI of defendant's answer are true, except that in paragraph IV the amount * * * should read '217 net tons.'" That the material allegations of the complaint, except in respect to the making of the contracts, "are untrue."

The material portions of the contract read:

"This agreement, made this 16th day of May, 1922, by and between the United States of America, acting by R. K. Morris, Chief Quartermaster, under the authority of the Governor of the Panama Canal, hereinafter referred to as the Panama Canal, and the Rosenberg Iron & Metal Company, of San Francisco, Cal., hereinafter referred to as the contractor, a successful bidder under circular letter of the Panama Canal inviting proposals for the purchase of iron and steel, dated February 23, 1922, and under an award approved by the Secretary of War under date of May 8, 1922, witnesseth:

"Art. 1. The contractor hereby agrees to purchase, accept delivery of, f. a. s. Balboa, Canal Zone, make payment for, and remove as hereinafter provided, material in character, quantity, and price as follows:

"5,436 net tons (approximately) of vari-

ous classes of iron and steel, as set forth in attached list, per net ton, $14.55. Total, $79,093.80.

"1,240 gross tons (approximately) of cast iron scrap, classification No. 9, per gross ton, $10.75, Total, $13,300.00.

"It is understood and agreed that the weights shown above are approximate and that payment will be made for actual weights delivered, the selling weight to be determined by the Panama Canal's official scales. * * *

Art. 2. The Panama Canal will deliver the material to the contractor f. a. s. vessel at Balboa, Canal Zone. * * *

"Art. 3. The contractor shall, prior to commencing the loading of such material on board a vessel at Balboa, Canal Zone, designate some suitable person as his representative on the Isthmus of Panama, within the Canal Zone, to whom the necessary orders in connection with the contract may be given. The person so designated shall be authorized to act for the contractor in carrying out such orders and in all other matters affecting the prosecution of the work of removing said material from the Isthmus. Should any dispute arise between the representative of the contractor designated as above and the local representative of the Panama Canal designated to act for it in connection with the removal of the material covered by this contract or as to whether any material claimed by the contractor is included in this contract or as to the manner of removing or as to compliance with any orders issued to govern the prosecution of the work, all questions involved in such dispute shall be referred to the Governor of the Panama Canal or his authorized representative for decision and such decision when given in writing shall be final and conclusive upon the parties hereto.

"Art. 4. The contract price of the material covered by this contract shall be paid * * * before the material is delivered to the vessel. In making final settlement only the actual weight of material delivered will be paid for at the unit prices specified herein. The title to the material will not pass to the contractor until it is fully paid for."

The circular letter of the Panama Canal, of date February 23, 1922, inviting bids for material covered by the contract, has attached thereto certain general conditions advising bidders that the material had been declared "surplus." Paragraph 5 of these conditions provides:

"The weights shown in the above items are approximate, and payment shall be made

for actual weights delivered, the selling weight of the material to be determined on the Panama Canal's official scales at the Isthmus. All bids submitted will be subject to prior sale of part of all the material bid upon, and to reduction in quantities of any items if unforeseen changes in situation make such action advisable; however, it is believed such action would be necessary in very few cases, if any."

The question presented upon plaintiffs' first cause of action is whether the government could, after the execution of the contract, subtract 217 net tons of iron and steel embraced within the quantity specified in the contract. It will be noted that the contract calls for "5,436 net tons (approximately)," while the court found that plaintiffs agreed to purchase and the Panama Canal agreed to sell 5,219.76 net tons." It is therefore clear that this finding is based on the construction of the contract, that, regardless of the tonnage expressed therein, it covered only such amount of that class of material which was not in fact "surplus," and that the circular letter inviting bids for the material covered by the contract, and advising bidders that the material, which had been purchased for canal operation and maintenance, had been declared "surplus," was in effect part of the contract.

■ We think the court below did not err in its construction, and in making the finding in question. While it is true, as contended by counsel for defendant, contracts with the government are to be construed in the same manner as contracts between private individuals, nevertheless this does not militate against the rule, applicable to public contracts generally, that those who deal with the agents of the public must at their peril inquire into their power to bind their principal. Donnelly on Public Contract, § 11.

■ In this case certain "surplus" and "scrap" material was authorized to be sold. The fact that through inadvertence or error there was included in the contract certain material which was not "surplus," but which was in fact required for use in the operation of the canal, did not affect the fact that it was material not within the power of the agents to sell. Nor do we think the fact that it did not become apparent until after the contract was executed that the material withdrawn for canal use might be so required at all changes the legal situation. The fact is it was not "surplus" material, was not otherwise sold, but used for the purpose for which it was originally purchased by the government.

■ The court did not err in construing the contract in connection with the circular letter calling for bids. 41 USCA §§ 16, 17; Clark v. United States, 95 U. S. 539, 24 L. Ed. 518.

The questions presented in counts 2 and 3 of the plaintiffs' petition relate to alleged shortage in delivery of material purchased and paid for. It was stipulated: "That in the event that the court decides, in view of the terms of the agreement of May, 1922, as set forth in the second cause of action, plaintiff is not precluded under terms of the agreement by the weights of the Panama scales from proving weights on other scales, plaintiffs' witnesses will testify that the record of the certified public weighmaster for weights made at San Francisco will show that there was a shortage of 200⅕ tons, the contract price on which is $2,912.91." It was "further stipulated that the theoretical weights given in the Pocket Companion of the Carnegie Steel Company for weights of iron and steel, which has not actually been weighed, corresponds to the actual scale weight."

We think the court below did not err in holding the plaintiffs bound by the weights of the Panama scales. While it may be conceded that plaintiffs should not be required to pay for material which they did not receive, and even assuming that the weight of the material upon arrival at the port of San Francisco is correctly shown by the record of the certified public weighmaster, it does not follow that such record of weight governs in the premises. The contract provides "the selling weight to be determined by the Panama Canal's official scales."

Doubtless for the purpose of avoiding controversies such as presented upon this count, and also for a means of their determination, should they arise, it was provided in the contract that "the contractor shall, prior to commencing the loading * * * designate some suitable person as his representative on the Isthmus of Panama within the Canal Zone, to whom the necessary orders in connection with the contract may be given. The person so designated shall be authorized to act for the contractor * * * in all other matters affecting the prosecution of the work of removing said material from the Isthmus. Should any dispute arise, * * * all questions involved in such dispute shall be referred to the Governor of the Panama Canal * * * for decision, and such decision when giving in writing shall be final and conclusive upon the parties hereto." The contractor, appellants herein, did not provide such a representative, but left

the matter of weighing and delivery to vessels to the officials of the Panama Canal.

It is suggested that a loss might have occurred subsequent to weighing, and prior to delivery aboard vessel, but there is no evidence that such a thing occurred. It is also urged that in the case of some 30 carloads of material the weight was not taken upon the Panama scales at all, and only theoretical book weights taken therefor. This was occasioned by the fact that some of the iron was of such lengths that two cars had to be used together, while the scales could only weigh one car at a time. It is, however, stipulated that such theoretical weight "corresponds to the actual scale weight."

With respect to the third count of the petition, it was stipulated: "That there was a shortage of 17.21 tons of material called for in the terms of the contract of July, 1922, which, according to the contract price, amounted to the sum of $118.68." It is contended by counsel for appellants that judgment should have been entered in their favor for at least this amount by reason of this stipulation. It appears, however, from the evidence and findings, that this particular shortage was accounted for and correctly adjusted in the final settlement on that contract.

Judgment affirmed.

DIETRICH, Circuit Judge (dissenting). I dissent in respect of the conclusion reached by the majority on the first cause of action.

Of date February 23, 1922, the purchasing department of the Panama Canal, by direction of the Secretary of War, issued a circular letter inviting proposals for the purchase of a large amount of material, specifically inventoried and designated therein as "surplus iron and steel." Attached to the inventory was a sheet entitled "General Conditions," containing numerous paragraphs.

Responding to the invitation, appellants submitted a proposal to purchase certain of the material, which in due course was accepted, with the approval of the Secretary of War. Accordingly on May 16, 1922, a formal written contract, prepared by the department, in harmony with the advertisement and offer to purchase, was executed. After reciting the facts already stated, the contract set forth that the appellants, referred to as the contractor, agreed to purchase and accept delivery, f. a. s. Balboa, Canal Zone, pay for, and remove, in the manner prescribed, 5,436 net tons of iron and steel as described in an itemized list, consisting of 37

pages, attached to the contract, at the price of $14.55 per ton, or a total of $79,093.80, and also 1,240 gross tons of cast iron scrap at $10.75 per ton, or a total of $13,300.

It was stipulated that the weights specified were approximate only, and that payment was to be made for actual weights delivered, "the selling weight to be determined by the Panama Canal's official scales." Classification of material was guaranteed by the appellee, but not the condition of the material. There followed detailed requirements covering notice to be given by the contractor of the arrival of vessels and of its shipping arrangements. The entire amount of material was to be removed by the contractor within six months from the date of the contract. Penalties were stipulated to be paid by the contractor in case of failure so to remove the material, and in the event of delay for more than six months appellee was at liberty to cancel the contract, sell the material, and charge expense and loss on account of resale to the contractor.

It was further stipulated that, before commencing to load the material, the contractor should "designate some suitable person as his representative on the Isthmus of Panama, within the Canal Zone, to whom the necessary orders in connection with the contract may be given," with authority to act for it in all matters effecting the prosecution of the work of removing the material. Provision was also made for the time, place, and manner of payment, and it was stipulated that title should not pass until the material was fully paid for. Assignment of the contract was forbidden, and finally it was declared that no member of Congress or any person employed in the service of the United States should have any interest in the contract or share in the benefits thereof. The instrument was duly executed upon behalf of both parties.

It is conceded that the proposal, its acceptance, and the contract all related to the same specific, identified, lot of material then owned by the Panama Canal; that under such conditions as existed or could be foreseen at all times up until after the contract was executed and a part of the material delivered, the Panama Canal had no use therefor, and that the same was in the judgment of the Secretary of War "surplus"; and that the government declined to deliver 217 tons of the lot of 5,436 tons, not because of any shortage in actual weight, but because, in view of "unforeseen conditions" subsequently arising, its officers later concluded it would

be advisable for the Canal to retain and use this amount.

The point most insistently urged by the appellee is that as to the undelivered material the contract was void, for the reason that administrative officers had the power to sell only "surplus." Such may be the limitation of their authority, but under a familiar rule the findings of such officers, exercising their judgment in good faith, upon questions of fact, are conclusive, and at the time the contract was entered into the material was by them held to be surplus. While under the rule it is not highly material, we have here the additional consideration that, at the time such determination was made, it was the only view that could be reasonably taken, for under any conditions that could be foreseen the material would not be needed. Pushed to its logical conclusion, the appellee's position is that unforeseeable conditions subsequently happening may retroactively operate to render void from the beginning a contract which was valid when it was entered into. And if it had the right to decline to make the delivery in question it could with equal propriety recover the material it did deliver, if under conditions subsequently devloping it reached the conclusion that it could itself advantageously use it.

It is further argued that, if the contract be held valid, it is to be taken as qualified by paragraph 5 of the "General Conditions" contained in the circular letter inviting bids, which is as follows:

"5. The weights shown in the above items are approximate, and payment shall be made for actual weights delivered, the selling weight of the material to be determined on the Panama Canal's official scales at the Isthmus. All bids submitted will be subject to prior sale of part or all of the material bid upon, and to reduction in quantities of any item if unforeseen changes in the situation make such action advisable; however, it is believed such action would be necessary in very few cases, if any."

But, as we have seen, the instrument of May 16th upon its face appears to be a full and comprehensive expression of the final agreement of the parties, and I am clearly of the opinion that it was intended and understood to be the exclusive evidence of such agreement. It is not a case where parties proceed upon the assumption that the advertisement, proposal, and the acceptance thereof, constitute the contract; nor is it a case where the court is asked to resort to antecedent or contemporaneous writings between the parties to resolve an ambiguity in the instrument, or to supply an inadvertent omission therefrom upon a material detail. The instrument of May 16th is clear and complete, and imports nothing from the other writings by reference or adoption.

From the beginning both parties contemplated that the negotiations would so culminate, for by the circular letter bidders were advised that the conditions thereof would be made a part of the contract to be entered into. And upon comparing the final contract with the circular letter we find in it such of the conditions as apparently were thought to be material and then applicable. The sentence, "All bids submitted will be subject to prior sale of part or all of the material bid upon, and to reduction in quantities of any item if unforeseen changes in the situation make such action advisable, * * *" was intended as a caveat to bidders and not a warning to contractors. It advised them that, in case the stated contingencies occurred prior to acceptance of the bids, bidders must expect to take contracts for smaller amounts of material than those specified in the advertisement and in the bids. As the advertisement stated, "bids," not "contracts," were made subject to the conditions. In the circular letter "reduction in quantity" and "prior sale" are co-ordinate phrases, and, if the one operated to reserve to the appellee the right after the contract was entered into to reduce the contract quantity because of "unforeseen conditions," the other was equally effective to reserve the right to "sell" and thus reduce the deliverable quantity.

In that view the appellee would be under no absolute obligation to make any delivery at all, and an apparently binding contract would become wholly wanting in mutuality. If contractors must take such chances, it is inconceivable that intelligent men would bid for "surplus" material, or at least that they would bid a fair price therefor, and hence a practice in harmony with the contentions of the appellee would result in frustrating the very purpose for which competitive bidding is sought, and the government would be unable to get fair offers for its materials. That appellee's officers did not intend the provision of the circular to be a condition in the contract is not open to doubt. Some of the conditions contained in the circular letter are incorporated in the instrument in almost identical language. The officers who prepared the contract were careful to embody therein the first sentence of this paragraph 5 of the "Conditions," but the other sentence

thereof, the one here in question, and, under the contention now urged, the more onerous, they omitted. To assume inadvertence would be preposterous, and the only reasonable explanation is that they thought, as I think, it was intended to be a condition only of the bids, and not of the contract. The contemporaneous construction put by a party upon his own writings may be of great weight. Lowrey v. Hawaii, 206 U. S. 206, 222, 27 S. Ct. 622, 51 L. Ed. 1026.

Sections 3744 and 3745, U. S. R. S. (41 USCA §§ 16 and 17), require that in certain cases, including one like this, public officers, upon entering into a contract, must cause the same to be reduced to writing and signed by the contracting parties, and must make a return of their acts by filing in the returns office of the Department of the Interior, attached together, a copy of the contract, a copy of any advertisement for bids, and copies of all proposals made in response thereto, supported by an affidavit of the officer in the form prescribed. And because of this provision it is argued that "the 'contract' must be read with the advertisment for bids, the bids, offers, and proposals." Undoubtedly the object of the statute was to impose upon public officers a restraint and deter them from entering into reckless engagements, and to provide against fraud and perjury incident to the false assertion of alleged oral agreements. Clark v. United States, 95 U. S. 539, 542, 24 L. Ed. 518. But a provision intended to regulate the conduct of government officers by requiring them to make a verified return of negotiations leading up to the execution of a contract, which is reduced to writing and signed by the parties, is not to be construed as destructive of the fundamental rule that the ultimate writing purporting to be complete in itself supersedes all prior negotiations, and when clear upon its face becomes exclusive evidence of the agreement. Brawley v. United States, 96 U. S. 173, 24 L. Ed. 622; Simpson v. United States, 172 U. S. 379, 19 S. Ct. 222, 43 L. Ed. 482.

Under appellee's contention, its officers deliberately violated the statute, and the wholesome purpose for which it was enacted would be defeated. It was the duty of the officers to reduce the ultimate agreement to writing and cause it to be signed by the contracting parties; whereas under appellee's view they caused only a part of it to be so embraced in the contract. And if the government is at liberty, by resorting to evidence aliunde, to vary or add to the terms of the signed contract, which is clear upon its face

and apparently complete, the door is open for like action on the part of the contractor, when it is to his interest to make it. Instead of the intended statutory certainty, we would therefore have only confusion and controversy. We need not consider what would be the effect of the statutory return, if it appeared therefrom that the contract as executed was beyond the range of the advertisement, or was inconsistent therewith, or was not awarded upon the best bid. Admittedly the contract here was fairly and duly awarded, and it is found to be in harmony with the advertisement and the bid.

It is hardly necessary to add that the clause to the effect that the weights were approximate only becomes immaterial in view of the fact that the sale was admittedly of a specific identified lot, the actual weight of which was up to the estimate. Had the actual weight turned out to be 5,219 tons, instead of 5,436, of course, the appellee would have rested under no obligation to make good the shortage.