### ELKAN v. SEBASTIAN BRIDGE DIST. FIDELITY & DEPOSIT CO. OF MARYLAND v. SAME. SEBASTIAN BRIDGE DIST. v. ELKAN et al.

(Circuit Court of Appeals, Eighth Circuit. June 6, 1923.)

Nos. 5980–5982.

1. **Appeal and error ⬅172(1)—Points concerning deviations from contract required by engineer not considered, when not involved under pleadings.**

Where contractor, in his pleadings, claimed only right to annul contract for misrepresentations and recover on quantum meruit, points made on appeal concerning alleged deviations from contract required by engineer cannot be considered.

2. **Bridges ⬅20(2)—Contractor should have ascertained time borings were made, if considered important.**

If one taking bridge construction contract regarded time borings were made by engineer as of importance, he should have ascertained when they were made, and cannot claim to have been deceived merely because plans bore notation that they had been revised up to two or three months before contract was entered into.

3. **Bridges ⬅20(2)—Contractor's acceptance of borings as indicating subsoil conditions not proof that they were warranted to be as indicated.**

That bridge construction contractor accepted results of borings made by bridge district's engineers as sufficiently indicating subsoil conditions was not proof that district warranted conditions to be as indicated thereby.

4. **Bridges ⬅20(2)—District held not to have warranted that subsoil conditions were as indicated by borings.**

Under specifications for bridge construction contract stating that borings had been made and that findings were as indicated, that data furnished bidders were to be considered as approximate, etc., bridge district *held* not to have warranted that subsoil conditions were as indicated by the borings, but only that results of the borings were correctly shown.

5. **Bridges ⬅20(2)—Contractor should have made inquiry, if in doubt as to matter as to which drawings in conflict.**

Though one sheet of plans on which bridge construction contract was based indicated that boring made by bridge district's engineer went to bedrock, where the sheet which showed details and findings of the borings indicated that it did not, contractor should by inquiry have cleared up any doubt.

6. **Bridges ⬅20(2)—Contractor held not entitled to rely on finding sufficient gravel in making excavations.**

Though borings made by bridge district's engineer, the results of which were included in plans for bridge, showed gravel, contractor had no right to rely on finding sufficient gravel in making excavations for piers and abutments, where there was no warranty that subsoil conditions would correspond with the borings, and specifications expressly stated that gravel which might be used might be found "near" the bridge site.

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

7. **Bridges ☞20(2)—Contract construed as to concrete mixture to be used in pier shafts.**

Where specifications of bridge construction contract provided that bases of piers and abutments below spring line of arches (which in the case of abutments corresponded with top of the base, but in the case of piers was some distance up the shaft) should be composed of cement, sand, and gravel in certain proportions, but that concrete for other portions should contain relatively more cement, the whole of the pier shafts, and not merely that above spring line of arches, was to be of the richer mixture.

8. **Principal and surety ☞100(6)—Contractor's surety held not discharged because engineer required buttress added to pier.**

Under bridge construction contract and specifications therefor giving engineer large powers, including power to make changes, contractor's surety *held* not discharged because engineer ordered buttress added to pier weakened by reason of another change permitted.

9. **Bridges ☞20(2)—Engineer held authorized to require concrete work to be done by continuous pour method.**

Under bridge construction contract and specifications therefor giving engineer large powers over contractor in performance of the work, engineer *held* authorized to require that concrete work be done by continuous pour method, though making the work more expensive, and resulting, because of high water, in loss of material.

10. **Bridges ☞20(2)—Contractor held entitled to compensation for certain work ordered by engineer as an extra.**

Under bridge construction contract giving engineer large power as to changes, and providing that for minor changes compensation would only be allowed if, in opinion of engineer, contractor was put to additional expense, but that for work performed in connection with the bridge, but not included in plans or specifications, contractor should receive payment as for extra work, where engineer discovered necessity of buttressing pier after contractor had started to remove cofferdam, necessitating its replacement and reinstatement and use of pumps, contractor *held* entitled to compensation therefor as an extra.

11. **Bridges ☞20(2)—Principal and surety ☞100(6)—Construction of bridge contract by parties as including both approaches was binding, and contractor's surety not released by including such work.**

Where bridge construction contract and plans therefor included both approaches, and bids were required on both approaches, but specifications were contradictory, and included direct statement that one approach was not included, but both parties construed the contract as including such approach, such practical construction *held* binding, and contractor's surety not discharged by including such work.

Appeal from the District Court of the United States for the Western District of Arkansas; Frank A. Youmans, Judge.

Suit by M. M. Elkan against the Sebastian Bridge District, in which defendant filed cross-bill against plaintiff and the Fidelity & Deposit Company of Maryland. From a judgment for plaintiff for an insufficient amount, all three parties separately appeal. Decree modified, and cause remanded.

Vincent M. Miles, of Ft. Smith, Ark. (Thomas B. Pryor, of Ft. Smith, Ark., on the brief), for plaintiff.

James B. McDonough, of Ft. Smith, Ark., for defendant Sebastian Bridge Dist.

Frederick W. Lehmann, of St. Louis, Mo., for defendant Fidelity & Deposit Co. of Maryland.

Before STONE, LEWIS, and KENYON, Circuit Judges.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

STONE, Circuit Judge. This is a bill by Elkan against the Sebastian Bridge District to cancel a contract and for an accounting covering the value of the work done by plaintiff thereunder in partially constructing a bridge across the Arkansas river at Ft. Smith, Ark.

The answer of the district included a cross-bill praying that the contract be affirmed, that the Fidelity & Deposit Company of Maryland, surety on Elkan's construction contract bond, be made a party, and that recovery for failure to perform the contract be given it against Elkan and against the surety. The surety answered praying discharge from the bond. By subsequent pleadings the issues were settled and a trial on the merits resulted in a decree dismissing Elkan's bill for want of equity and sustaining recovery on the cross-bill in the sum of $101,082.67.

From this decree, all three parties have separately appealed.

The bases of the bill were fraudulent misrepresentations and mutual mistake concerning the sub-soil conditions where the excavations for the bridge supports were to be made and concerning the presence of gravel which would be useful to the contractor in the portions of the structure to be formed from concrete. The basis of the cross-bill was failure to perform the contract. The basis of the answer of the surety was release for the reasons set forth in Elkan's bill and also for certain changes, alterations in and deviations from the contract.

The errors here urged by Elkan are:

(1) In holding that the contractor, under the plans and specifications, assumed the risk of sub-surface conditions and that the presence of quicksand and the absence of soft shale and soapstone constituted no misrepresentation or breach of warranty.

(2) In holding there was no misrepresentation by the district with reference to the availability of gravel to be used in mixing the concrete.

(3) In holding that the requirement of the engineer that the part of the piers between the footing and spring line of the arches should be constructed of a higher grade of cement was no deviation from the contract.

(4) In holding that successive changes in the construction of pier No. 2 required by the district engineer were not deviations from the contract.

The errors here urged by the surety are the four just stated and also:

(5) In holding that construction of the west or Oklahoma side approach to the bridge was not a variation in the contract.

The errors urged by the district are that the court held the west approach to the bridge not within the contract and that the court entered a final decree for $101,082.67, based upon estimates of the cost necessary to complete the bridge by contractors who had replaced Elkan, instead of waiting until the bridge was completed and securing the actual total loss which would then be ascertainable.

Because of the nature of the questions presented by the appeal of the district, we will consider first the appeals of Elkan and of the surety company with the view of determining whether the decree was for the proper party.

In the consideration of these two appeals, attention will be given first to the points involved in the Elkan appeal, as they are also involved in the surety company appeal; and if the decree is determined to be proper as to Elkan, examination will then be made of those contentions peculiar to the surety company.

The district was organized under a specific statute of the state of Arkansas for the purpose of constructing and empowered to construct a bridge across the Arkansas from a point in Ft. Smith, Ark., to the Oklahoma side. Elkan contracted to build this bridge and the surety company executed the required bond to secure performance of this contract. After he had constructed a considerable portion of the bridge, Elkan ceased work and brought this action for cancellation of the contract and for accounting in relation to the work done. In the printed brief, his counsel state the substance of the grounds for the suit to be that:

"He charged that false representations were made with regard to sub-surface conditions at and before the execution of the contract and that the contract as entered into between himself and the Bridge District was executed under a mutual mistake of fact as to the subject matter of the contract. He claimed that the false representations and mistake consisted in the positive representations of the engineer as to the truth of the matter shown on the boring sheet with reference to the sub-surface and under-water conditions and that these conditions were untrue, particularly with reference to the material for the excavations for the abutments and bents for the approach and as to the location of the soft shale and soapstone in the bed of the river."

[1] The points urged here are (1) that the contract was based upon certain representations to the contractor concerning sub-soil conditions which he would encounter in his work and that these representations were mistakenly or fraudulently untrue; (2) that it was falsely represented that a sufficient supply of gravel suitable for concrete mixture was near the bridge site; (3) that the requirement by the engineer that portions of the piers (above the footing and below the spring line of the arches) be constructed of a more expensive concrete mixture was a deviation from the contract; (4) that changes in the construction of pier No. 2, required by the engineer, were deviations from the contract. A careful examination of the pleadings and the issues made thereby reveals that Elkan claimed the right to annul the contract and recover on a quantum meruit. This is his only claim. That claim is based solely upon misrepresentations as to sub-soil and gravel conditions. Therefore, although Elkan has presented to this court the points of the concrete mixture and of changes in construction of pier No. 2, they can and will be considered only from the standpoint of the surety company, which properly raised those issues.

## Sub-Soil.

The sub-soil conditions involved are of two general classes: Presence of quicksand, which was encountered at the site of the abutment A, on the east end of the bridge, and at the site of one of the pedestals supporting the approach to the east end of the bridge; absence of soft shale and soapstone immediately overlying the bedrock upon which certain of the piers were to rest. The bearing of these sub-soil conditions upon the work is that it was much more difficult and expensive to go through quicksand to bedrock in the construction of abutment A.

than through clay and other soft sustaining substances which was what was anticipated at this point; that the presence of quicksand at the pedestal site required the contractor to go much deeper at materially greater expense in order to find a suitably solid base for the pedestal; that the absence of soft shale and soapstone overlying the base rock at the pier sites made unsuitable the cofferdam method of construction which would have been entirely suitable to this overlying soft rock and which method the contractor had adopted and was employing because of the supposed presence of the soft rock, thus greatly and expensively changing working conditions.

Recognizing the materiality and importance of these sub-soil conditions, we turn to the claims of Elkan and the surety company respecting the liability therefor. The theory advanced is that the contract was based upon certain representations of the district as to sub-soil conditions which excluded the quicksand actually found and included the soft stone not found; that these representations were of facts intended to induce and actually inducing action by Elkan; that they were knowingly or recklessly and, therefore, fraudulently made; that, at any rate, they amounted to warranties; that being untrue, they excuse Elkan from further performance and entitle him to recover.

A process of elimination will narrow this issue. We find no reason, in the evidence, for overturning the finding of the trial court that there was no actual fraud present. The evidence as to the soft stone conditions actually found in the river bed at the pier sites is conflicting and, in some particulars, confusing. Much of the time and labor in examining this and other questions of fact could have been saved this court had the parties complied with the rule requiring statement in narrative form. While some of the evidence should have been set out verbatim yet much of it could have been narrated. Appellants Elkan and surety company have prepared an abstract of the testimony which has been useful to us, but attack upon the verity and accuracy of this abstract has compelled us to examine the evidence at length. Upon this particular point there is much strong evidence upon which a finding might be made either way. The matter is by no means free from doubt. As to whether the soft material was present to an extent that it would serve the purposes in mind by Elkan—open cofferdam operations—there is a conflict of evidence. There is some question in our minds as to whether the trial court made a finding upon this latter matter. Such finding can be only deduced from the general method of disposing of this entire sub-soil controversy. The court found no misrepresentations as to either quicksand or soft material and then determined that there was no warranty as to the sub-soil conditions and therefore no liability for mutual mistake. In so far as a finding can be inferred from this disposition of the matter, it would seem to be that the soft material was not found. Under the sharp conflict of evidence on this point we incline to accept this view.

There is no question of the existence of quicksand at abutment A and the east approach pedestal involved. Therefore, we enter the consideration of this matter with the view that the sub-soil conditions actually found during the progress of the work were, at the pier sites, abutment A and the pedestal of the eastern approach different from what would have been expected from the showings of the borings.

[2] It is urged that the location of abutment A was changed from the original location by the district engineer, that the borings were made some time before the contract was let and that the borings were made by the "wash" method. Of course, if the sub-soil conditions were warranted to be as revealed in the borings, then all these contentions become immaterial and the only question is whether the warranty was true. If such warranty is absent, these contentions are pertinent upon the question whether any or all of them operated to deceive the contractor. As to the change in abutment A, the situation was that the engineer originally contemplated a somewhat different location. That intention was present at the time the borings on the east bank were made and two of such borings were evidently made to test the site then in mind for this abutment. Later consultation between the engineer and officials of the War Department resulted in the actual location of the abutment in a near-by but different place. The plans and blueprints were prepared with location as actually made and, in 1917, bids were made to build the bridge. No contract was let on this bidding. Thereafter changes were made in the plans for the superstructure and bids were again made in 1919 resulting in the Elkan contract. It cannot be contended that the relative position of borings and abutment A (as actually located) were not truthfully shown on the prints at the time Elkan bid and made his contract; nor that the location of the abutment was changed at any time after Elkan saw the prints. Therefore, the change, occurring long before he became interested in the matter, could have had no effect upon him. We are not impressed with the contention that Elkan was affected by the fact that the borings were made about 19 months before the contract was executed. It is not shown that borings made that long before would not represent the sub-soil conditions existing at the execution of the contract or at the time the work was done thereunder. If Elkan regarded the time of the borings as of importance he should have and could have ascertained when they were made. He cannot claim to have been deceived in this regard merely by the fact that the plans bore the notation that they had been revised up to two or three months before the contract was entered into.

The contention as to the method employed in making the borings is equally weak. It is not shown that any representation was ever made by the district that would deceive Elkan as to the method used. Had he deemed this information important, it was easily procured. Besides, the evidence shows that the "wash" method employed was one of the accepted methods of making borings; and the evidence is no more than conflicting on the point of the propriety or efficacy of its use here.

It is contended, also, that the boring sheet did not truthfully reveal the findings of the borings. We think the evidence supports the findings of the court that the results of the borings were fairly and truly recorded on the boring sheet.

As the result of the borings and the places they were made was truthfully communicated to Elkan and as the excavations for the piers, abutment A and the approach pedestal revealed sub-soil conditions different from what would naturally have been deduced from

the borings, the sub-soil controversy resolves itself into the construction of the contract to ascertain whether Elkan assumed the risk of the sub-soil conditions at the pier sites, abutment A and the approach pedestal or whether the district warranted that the borings revealed such sub-soil conditions. The question is whether, accepting the borings as truly made and as truly made known to Elkan, the district warranted that the sub-soil conditions shown thereby would reveal those he would encounter in his work. None of the piers nor either of the abutments was located where borings were made except boring No. 10 lay within abutment A. Borings were made near the abutment sites. Between the 15 piers there were only six borings and these were not at all equidistant. The piers were numbered from the east bank. There were two borings west of pier No. 1, the nearest about 40 feet from the pier and the other about that distance further west; another was about 70 feet west of pier No. 2; another, about 50 feet west of pier No. 3; another, about 40 feet east of pier No. 6; another, about 70 feet west of pier No. 10. Besides these six borings between the piers, there was one boring a short distance east of the west shore abutment (B), two between pier No. 1 and the east shore abutment (A), one within the eastern edge of abutment A and four at unequal distances along the eastern approach.

The sole purpose of making borings is to secure information as to sub-soil conditions. The sole purpose of making these borings was to secure such information with a view of estimating the sub-soil conditions which would be encountered in building this bridge. Such information and estimation would be valuable alike to the district and to the builder. The borings were made where and to the depth thought necessary by the engineer of the district to enable him to estimate such sub-soil conditions. Of course, any one would realize that the actual sub-soil conditions might, except where and to the depth shown by the borings, be different than so shown. The actual conditions were hidden. The borings were merely indications, at certain places and to certain depths, from which deductions might be drawn as to actual conditions along the line and to the depths of such borings. Both parties knew that deductions so drawn might prove untrue when the necessary excavations were made.

[3] The question here is who took the risk of these deductions? Either the district or the contractor must take this risk. Either could legally do so. Construction of the contract in the light of applicable legal principles must determine which did. That the district made known to Elkan the result of the borings is certain. This was done with one of two purposes: (1) To be the statement of a fact (sub-soil conditions to be encountered) upon which he might rely and act; or (2) as useful information which he might accept as sufficient or not as he thought wise, leaving him to make such further and other investigation as he might wish. The fact that Elkan did accept such information as sufficient is no proof, one way or the other, that the district contracted with him that it would warrant the sub-soil conditions to be as indicated by the borings.

[4] In paragraph 1 of the contract the contractor agrees to build the bridge "all in accordance with the plans and specifications hereto at-

tached and made part hereof." In paragraph 2, he agrees to furnish a bond "for the faithful performance of this contract and the specifications and of all of the terms and conditions therein contained." The plans consisted of nine blue prints of which seven relate to details of parts of the bridge not involved in this sub-soil contention. The two prints here material are sheet 2–A and sheet 3. Sheet 2–A is a "general plan, profile and cross-section of the bridge." Sheet 3 is a "profile of borings and map of bridge site." These sheets will be adverted to after examination of pertinent portions of the specifications.

The only references in the specifications pertinent to this matter are contained in paragraph "f." We quote the entire paragraph italicizing the portions more directly applicable here, as follows:

"f. Abutments, Piers, Pedestals and Retaining Walls.

*"Borings have been made at the bridge site, and the findings are as indicated on sheet No. 2.. The data furnished to bidders by the engineers regarding ( ) of foundation or of bedrock are to be considered as approximate, and bidders must assume the risk of having to carry the foundations to a greater or less depth without altering their schedule of unit prices.*

"The bases for the abutments and piers for the arch spans are to be carried into the bedrock at least one foot, and more if the engineers so desire. *The bedrock is a hard, blue shale.* The sinking of these piers and abutments may be done either by the pneumatic process or by means of open cofferdams.

"If the sinking is done by the open process, the cofferdams must be of such character that the required excavation in the bedrock can be made, and the concrete be deposited without injury from the water.

"Bidders are to state in their tenders the method they propose to use in sinking the piers.

"The contractor shall prepare complete working plans for his caissons or cofferdams and shall submit same to the engineers for their approval, and no work shall be done on, nor material be ordered for these constructions until said plans are approved by the engineers.

*"The pedestals for the concrete viaduct and the concrete retaining walls are to be founded upon the earth at the depths shown on the plans, or at such other depths as the engineers may direct.* Suitable shoring must be provided to prevent caving of banks."

There is no sheet 2, referred to in the above quotation, but this must refer to sheet 3 of the plans which is the only sheet showing the "findings" of the borings. On sheet 2–A the location and relative depth (based on a fixed elevation) is shown but no "findings" as to the borings.

[5] In this place, and parenthetically, may be disposed of an argument based on the fact that on sheet 2–A the boring No. 10, at the site of abutment A, is shown as going to bedrock. Standing alone this sheet would show that this boring was to bedrock. However, such information alone would be of no possible value to any one. The important information desired is what the boring showed between the surface and bedrock. To obtain this information, reference must be made to sheet 3 and that sheet alone. Examination thereof at once reveals that it did not go to bedrock. That is the only sheet showing the details and findings of the boring and would control in the mind of any one examining the two. Therefore, Elkan must have known that the showing on sheet 2–A of this boring going to bedrock was not accurate. At least, it would have shown a difference which he could and should have cleared up through inquiry if he had any doubt as to

the situation. Sheet 2–A was a profile print showing in outline the entire bridge, bedrock, location of borings, and various general data. Sheet 3 is a print showing elevation of land and water surface along the bridge line, location, depth and detailed showings of the borings and relative location of piers and abutments.

Having in view the matter now involved, examination of the above paragraph "f" results as follows: The boring sheet was furnished the bidder and the showings there revealed stated, as a fact, to be true; bedrock is stated, as a fact, to be a hard, blue shale; data furnished by the engineer as to foundation or bedrock is stated to be "approximate, and bidders must assume the risk of having to carry the foundations to a greater or less depth" without change in price; abutments and piers are to rest on bedrock and pedestals upon earth "at the depths shown on the plans, or at such other depths as the engineers may direct." The only statements here made as to sub-soil conditions are that the boring sheet is true and that the bedrock is a hard, blue shale. There is no question as to the character of the bedrock. The trial court found, upon sufficient evidence, that the boring sheet was true. Therefore, the district made no misrepresentation of fact when it made the two above statements. From what are we to infer that it also stated, much less guaranteed, that the sub-surface conditions, where excavations were to be made, were revealed by the borings? The bare statement that the boring sheet may be relied upon as accurate is entirely different from saying that the sub-soil along the bridge line is as shown by the boring sheet. One is a statement that certain evidence of an ultimate fact exists; the other is a statement that the ultimate fact exists. The statement here made goes, in effect, little further than if the boring sheet had, without comment, been furnished the bidder. It would be of no value to any one unless it were true and there would be no purpose in furnishing it unless it were furnished as a true showing of the borings. Moreover, the boring sheet was part of the data furnished by the engineers which concerned the foundations of the piers, abutments and pedestals and the statement is made that "the data furnished to the bidders by the engineers regarding of foundation * * * are to be considered as approximate and bidders must assume the risk of having to carry the foundations to a greater or less depth" at the same price schedule. Nor does the fact that the plans show the location of the borings and contain the boring sheet either add to or take away from this conclusion.

But we are cited to certain decisions which, it is contended, compel the opposite conclusion. Such are McArthur Bros. Co. v. United States, 258 U. S. 6, 42 Sup. Ct. 225, 66 L. Ed. 433; United States v. Smith, 256 U. S. 11, 41 Sup. Ct. 413, 65 L. Ed. 808; United States v. Atl. Dredging Co., 253 U. S. 1, 40 Sup. Ct. 423, 64 L. Ed. 735; United States v. Spearin, 248 U. S. 132, 39 Sup. Ct. 59, 63 L. Ed. 166; Christie v. United States, 237 U. S. 234, 35 Sup. Ct. 565, 59 L. Ed. 933; Hollerbach v. United States, 233 U. S. 165, 43 Sup. Ct. 533, 58 L. Ed. 898; Simpson v. United States, 172 U. S. 372, 19 Sup. Ct. 222, 43 L. Ed. 482; Hingston v. Smith Co. (C. C. A. 6) 114 Fed. 294, 52 C. C. A. 206; Wyandotte & D. Ry. v. King Bridge Co. (C. C. A. 6) 100 Fed. 197, 40 C. C. A. 325; Salt Lake City v. Smith (C. C. A. 8) 104 Fed. 457,

43 C. C. A. 637; and two cases on the district, King Iron B. & M. Co. v. St. Louis (C. C.) 43 Fed. 768, 10 L. R. A. 826, and Levee District v. Roach, 174 Fed. 949, 99 C. C. A. 453.

McArthur Bros Co. v. U. S., 258 U. S. 6, 42 Sup. Ct. 225, 66 L. Ed. 433, was an action by a contractor against the United States for breach of contract growing out of alleged misrepresentation. The claimed misrepresentation was that certain parts of a canal, being constructed under the contract, could be done "in the dry." It turned out that such construction could not be made "in the dry." The representation relied upon was a requirement in the contract that certain portions of the work "shall be performed in the dry." The court held that the United States made no representations that the work could be done in the dry and that the contract expressly required the contractor to acquaint himself with the conditions. The court after distinguishing the Hollerbach, Christie and Atlantic Dredging Company Cases, said (258 U. S. 12, 42 Sup. Ct. 227, 66 L. Ed. 433):

"The elements which existed in each of the cited cases are absent from the case at bar. In the case at bar the government undertook a project and advertised for bids for its performance. There was indication of the manner of performance but there was no knowledge of impediments to performance, no misrepresentation of the conditions, exaggeration of them nor concealment of them, nor, indeed, knowledge of them. To hold the government liable under such circumstances would make it insurer of the uniformity of all work and cast upon it responsibility for all of the conditions which a contractor might encounter and make the cost of its projects always an unknown quantity. It is hardly necessary to say that the cost of a project often determines for or against its undertaking."

On the same page, the court said that the government had been held liable in the Hollerbach Case because "'the specifications spoke with certainty as to a part of the conditions to be encountered by the claimants' and of those, it was said, 'the government might be presumed to speak with knowledge and authority.'" The Christie and Atlantic Dredging Company Cases are stated to have been based on false statements as to conditions made with knowledge of such falsity.

The case of United States v. Smith, 256 U. S. 11, 41 Sup. Ct. 413, 65 L. Ed. 808, was an action on contract to recover for being compelled to excavate limestone rock in place under a contract to excavate "clay, sand, gravel, and boulders." No question of misrepresentation was in the case and the decision turned solely on the point that rock in place could not be classified under "clay, sand, gravel, and boulders," the only excavation covered by the contract.

The case of United States v. Atlantic Dredging Co., 253 U. S. 1, 40 Sup. Ct. 423, 64 L. Ed. 735, was an action to recover for misrepresentation as to the character of material to be encountered in a dredging work. The basis of that decision, by a divided court, is that false statements were made as to the character of material which were based on boring maps which did not truthfully reveal the results of the borings. There was concealment of facts concerning the borings which created a false impression upon the contractor and the government permitted him to embark upon the work with full knowledge that he was relying on the false statements and map. In the instant case there were no false statements nor false boring sheet. The only statement

was that the boring sheet was true and it was true and free from all concealment.

The case of United States v. Spearin, 248 U. S. 132, 39 Sup. Ct. 59, 63 L. Ed. 166, was an action for damages on a contract to build a dry dock. A portion of the work required was the relocation of a sewer which was on the site of the contemplated dry dock. The specifications prescribed the dimensions, material and location of the sewer section to be relocated. This relocation was made in compliance with the terms of the contract. Shortly afterwards, the relocated section burst, because of defects in other portions of the system unknown to either party, flooding the dry dock and it was evident that a sewer constructed as required by the contract would not be adequate but would threaten the work on the dry dock. The holding was that Spearin was not required to investigate and determine whether a sewer built according to the contract would be adequate but might rely upon performing the contract according to the specifications. The court said (248 U. S. 137, 39 Sup. Ct. 61, 63 L. Ed. 166):

"The risk of the existing system proving adequate might have rested upon Spearin, if the contract for the dry dock had not contained the provision for relocation of the six-foot sewer. But the insertion of the articles prescribing the character, dimensions and location of the sewer imported a warranty that, if the specifications were complied with, the sewer would be adequate."

The case of Christie v. United States, 237 U. S. 234, 35 Sup. Ct. 565, 59 L. Ed. 933, was an action for compensation because of misrepresentation of material to be found in excavating. The contractor had no time in which to make an independent examination and was invited to examine boring records made by the government, which boring records were offered as being true. The records did not truly represent what the borings had revealed. The features in the borings which were concealed would have revealed the conditions which caused the expense sued for.

Hollerbach v. United States, 233 U. S. 165, 34 Sup. Ct. 553, 58 L. Ed. 898, was an action for compensation because of a misrepresentation as to the materials "facing" a dam which was repaired by appellant under contract. The positive statement was made that the dam was "faced" with certain materials. The character of these materials seriously affected the expense of doing the repair work. The statement was relied upon and was untrue.

The case of Simpson v. United States, 172 U. S. 372, 19 Sup. Ct. 222, 43 L. Ed. 482, is relied upon by both parties. We think it supports neither. That decision was merely an application of the rule that prior negotiations are merged into the written contract and evidence thereof cannot be used to vary the written contract. During the discussion of the construction of the contract the court used language which we might apply here, saying (172 U. S. 381, 19 Sup. Ct. 225, 43 L. Ed. 482):

"The fact that the bidders knew that a test of the soil in the yard had been made, and drew the contract providing that the dock should be located on a site to be designated by the United States without any express stipulation that there was a warranty in their favor that the ground selected should be of a defined character, precludes the conception that the terms of the contract imposed such obligation on the government in the absence of a full and clear expression to that effect, or at least an unavoidable implication."

Another case, not relied upon by these appellants but along the same line as the above cases, is United States v. Stage Co., 199 U. S. 414, 26 Sup. Ct. 69, 50 L. Ed. 251. One of the points involved therein was a claim for compensation for furnishing mail carriage service to four stations in New York City when the government had stated in advertisements for bids for such service that there were but two stations. The court held that the statement was one of fact in a paper intended for information of bidders. It was untrue and had been acted upon; therefore recovery was allowed.

Of the cases cited from the Federal Reporter, Levee Dist. v. Roach, 174 Fed. 949, 99 C. C. A. 453, Salt Lake City v. Smith, 104 Fed. 457, 43 C. C. A. 637, Wyandotte & D. Ry. v. King Bridge Co., 100 Fed. 197, 40 C. C. A. 325, and King Iron B. & M. Co. v. St. Louis (C. C.) 43 Fed. 768, 10 L. R. A. 826, involved no question of misrepresentation. The case of Hingston v. Smith Co. (C. C. A. 6) 114 Fed. 294, 52 C. C. A. 206, was a case of false statement of an under-water condition to be encountered in excavating. This was a definite statement of fact that rock to be encountered was one foot in thickness, made by a party in position to know and acted upon by one who could not know.

The above decisions, dealing with misrepresentations which were bases of contracts, state no new principles of law nor any which are peculiar to the class of contracts here involved. But such decisions have no application to the facts of this case. Here there was no misrepresentation. The mistake of these two appellants is in interpreting the facts to mean that the district stated that the sub-soil conditions which would be encountered by the contractor were such as were shown by the boring sheets. The district made no such statement. It stated that the boring sheets showed truly what had been found by the borings. That statement was true. We think the court was right in holding for the district in the contention concerning sub-soil conditions.

### Gravel.

The specifications contain the following:

"There are some very fine beds of gravel and sand in the river near the bridge site and this gravel may be used if it complies with the following specifications:

"The gravel must be of clean, hard pebbles, free from dirt, soft rock or organic matter, and must conform to the respective sizes designated hereinafter for the different classes of concrete.

"It is hardly probable that this material as taken from the river will contain the proper proportions of sand and gravel, and if not the gravel will have to be screened and remixed with sand in correct proportions. The engineers will make the necessary tests to determine the quality of the material."

[6] The contention is that no beds of gravel, as here stated, existed. The evidence shows conclusively that the contractor who took up the bridge construction after Elkan stopped and who was carrying it on at the time of trial, was using gravel found in a large bed about three-quarters of a mile above the bridge site. The evidence, also, establishes that this gravel was of fine quality, in large amounts, and that as far as a mile upstream would, for practical construction work, be regarded as "near" the site. It is urged that the boring sheets showed gravel and, therefore, Elkan had a right to rely upon finding gravel enough,

where he made the excavations for piers and abutments, to enable him to complete his concrete mixtures at those places from the gravel found there. This is untenable for two reasons: First, as discussed under the sub-soil matter, there was no statement that the places of excavation would correspond to the borings; second, the statement concerning gravel, quoted above from the specifications, shows that the gravel intended was to be found elsewhere.

The surety company bases its claim for release on the two grounds above discussed and also upon material departures from the original contract made without its consent. What has been said above regarding the sub-soil and the gravel contentions, applies with equal force to the surety company as to Elkan. The claimed departures from the contract are three: Richer and more expensive concrete mixture used in portions of the piers; changes in construction of pier No. 2; and inclusion of the Oklahoma or west approach.

## Concrete Mixture.

[7] This controversy is over the concrete mixture to be used in the shafts of the piers. The piers are made up of two parts: The bases, which are the broad bottom portions supporting the shaft; and the shaft, which is the more slender and longer portion resting on the base and forming that portion of the structure from which the arches spring. The abutments are quite similar, though not exactly the same, as to these features of construction. Also, as shown by the plans, there is a difference between piers and abutments as to location of the spring line of the arches. As to piers, that line is some distance up on the shaft above the top of the pier base, while, as to abutments, that line coincides with the top of the base. The specifications, under the heading of "Grades of Concrete," provided for three concrete mixtures of different cement richness for use in different designated portions of the bridge. Such provisions pertinent here are as follows:

"For the bases of all piers and abutments below spring line of arches, the concrete shall be composed of one (1) part cement, two and one-half (2½) parts sand and five (5) parts broken stone or gravel to pass in any direction through a two (2) inch ring, and varying in size down to quarter inch pieces."

\* \* \* \* \* \* \* \* \* \*

"For all other portions of the structure the concrete shall be composed of one (1) part cement, two (2) parts sand and four (4) parts of stone, (      ) pass in any direction through a one (1) inch ring, and varying in size down to quarter inch pieces."

This appellant claims that the shafts up to spring line of arches were, under the specifications, to be constructed of the 1–2½–5 mixture rather than the 1–2–4 mixture, which latter was richer in cement content and, therefore, more expensive. It relies upon the language:

"For the bases of all piers and abutments below spring line of arches the concrete shall be composed of one (1) part cement, two and one-half (2½) parts sand and five (5) parts broken stone or gravel."

There is no dispute as to the mixture used in the abutments—the spring line of the arches clearly limits and defines that matter. The word "bases," as applied to abutments, would produce precisely the same result as the arch spring line definition. Since the arch springs from the top of what corresponds to the base in an abutment, to interpret the specification (as applied to abutments) to read "For the

bases of all * * * abutments below spring line of arches" would result in tautology. Unquestionably, "below spring line of arches" was intended to apply to abutments, therefore, it is rational to suppose that "bases" was intended to apply alone to piers. Again, since there is no doubt that the base of a pier is an architectural and structural unit different from the shaft and since the spring line of these arches from the piers was from the shafts at a line somewhat above the base, to apply the expression "below spring line of arches" to the bases of piers would be impossible or meaningless here. Nor can this result be avoided by saying that when the specification said "bases of all piers" it meant the entire pier (including base and shaft). Had such been the intention of the parties they would have said "for all piers." When they went further and used a term—"bases"—describing definitely a certain recognized part of the piers, they meant that term to have an effective meaning. The most that can be said, favoring this contention of this appellant, is that a casual reading of this specification might make it seem ambiguous. A careful study of it, having in mind the structure and the application of this specification, would leave no doubt as to the real meaning. We conclude, therefore, that the first provision of the quotation from the specifications did not apply to the shafts of the piers. As shafts are not, by name, provided for under this heading of the specifications, we must conclude that they are included in the catch-all clause in the second paragraph quoted, which is that:

"For all other portions of the structure the concrete shall be composed of one (1) part cement, two (2) parts sand and four (4) parts of stone."

We find no departure, in this respect, from the contract and this contention of the surety company cannot be allowed.

### Changes in Pier No. 2.

[8] This pier was the second from the east shore. The two spans springing therefrom were of unequal length, that to the east being about 146 feet and the one to the west being about 212 feet. This difference in span resulted in a difference of stress upon this pier and required additional strength in the east side of the base to withstand the greater stress from the longer span on the west side. This strength was provided for in the plans by an extension of the base to the eastward and by setting that portion of the base deeper into the bedrock than the one foot depth required under the entire base. When this bedrock was reached in excavating for this pier, it was found to be very hard. Excavation was very difficult in this hard rock. Therefore, the engineer of the district directed Elkan not to excavate the one foot under the entire base and the deeper excavation under the eastern extension of the base but to excavate around the periphery of the base only a trench 3 feet wide and 18 inches deep. This lessened the cost both to Elkan and to the district. Following this instruction, Elkan had constructed the pier to water level and was drawing the piling of the cofferdam surrounding the work. In the meantime the engineer discovered that this change in construction would interfere with the care for the extra stress from the longer west span, which had been partially provided for, in the original plans, through sinking the entire

pier and especially the eastern extension thereof into the bedrock. Therefore, when the work had reached the above stage, he instructed Elkan to add to the pier, as it then stood, a buttress of concrete on the eastern side. This is the change to which objection is made and it can be clearly understood only by inserting here the blue print (Exhibit U) portraying it:

SKETCH SHOWING
PIER #2 AS CONSTRUCTED

The contention is that this was a material change in the contract which released the surety. The obligation of the bond is to secure the full performance by Elkan of "all of his obligations as set forth in his contract." The specifications formed part of that contract. They contained several provisions here pertinent. They provided (Part I. C. Scope of Contract) for furnishing all material, plant and labor to fully complete the structure in accordance with the plans and specifications and that:

"This contract will also include all  *  *  *  and everything else which, in the opinions of the engineers, may be necessary to fully complete all of the work herein outlined in a first class and workmanlike manner, notwithstanding any errors or omissions in the plans and specifications."

"Part I. g. Intent of Plans and Specifications" provides:

"The plans which accompany the specifications are for the purpose of illustrating the general character and extent of the work and are subject to such modifications as may be found necessary or advisable either before or during the construction, and the contractor shall conform to and abide by whatever supplementary plans and explanations which may be furnished by the engineers for the purpose of illustrating the work in more detail. The engineers shall decide as to the meaning or intention of any portion of the specifications and plans where the same may be found obscure or in dispute, and shall have the right to correct any errors or omissions therein.

"All work that may be called for in the specifications and not shown on the plans, or shown on the plans and not called for in the specifications, shall be executed and furnished by the contractor as if described in both these ways; and should any work or material be required which is not denoted in the specifications or plans, either directly or indirectly, but which is nevertheless necessary for the proper carrying out of the intent thereof, the contractor is to understand the same to be implied and required, and shall perform all such work and furnish any such material as fully as if they were particularly delineated or described."

"Part VII. Miscellaneous. a. Specifications" provides:

"All work herein outlined must be done in strict accordance with these specifications, the accompanying plans, and such instructions as may be given from time to time by the engineers. All materials and workmanship will be thoroughly and carefully inspected and the contractor will be held at all times to the intent of the specifications.

"The intent of these specifications and plans is to provide for the work herein enumerated to be fully completed in every detail for the purpose designed; and it is hereby understood that the contractor, in accepting the contract, agrees to furnish everything necessary for such construction, notwithstanding any errors or omissions in the drawings or specifications."

"Part VII. c. Alteration of Plans" provides:

"The engineers shall have the right to make such minor changes in construction as they may see fit, and the contractor shall not receive extra compensation on account of such minor changes unless in the opinion of the engineers he has been put to such additional expense on account of said changes as to entitle him to receive extra compensation. The amount of any such extra compensation will be determined by the engineers."

Paragraph "6. Directions to Contractor," of paragraph "d. General Provisions Regarding Construction" of Part VII provides:

"The contractor shall commence work at such points as may be designated by the engineers, and he shall conform to their instructions as to the order and time in which the various parts of the work shall be done, and as to the force required to complete the work within the time specified."

"Part VII. e. Extras" provides:

"Should the commissioners desire any work performed by the contractor in connection with this bridge, but of a kind not included in either the plans or specifications, they shall have the right, under the contract, to issue orders in writing directly to the contractor, requesting the contractor to perform such work, and the contractor must, upon receipt of such orders, perform such extra work at the actual cost to him, plus ten per cent. (10%) for his supervision and the use of his plant and tools.

"No extras of any kind will be allowed unless ordered in writing by the commissioners. Satisfactory receipted vouchers will be required from the contractor for all such extra labor and materials.

"All bills for extra work must be presented for payment within thirty (30) days from the date of the completion of the particular work covered by them, otherwise they will not be allowed."

From the above-quoted provisions from the specifications, it is clear that the intent of the contract was to secure the construction of a strong, sufficient bridge; that such bridge was to follow substantially, but not exactly, the one described by the plans and specifications; that, to secure a strong, sufficient bridge, the district engineers might make such changes and alterations and supply such omissions in the plans and specifications as might, during the progress of the work, seem to them necessary; that if the alterations were of a kind included within the plans or specifications, pay therefor was to be at the contract rate, otherwise at the rate for "extras." Considering the character of the work ordered at pier No. 2 and the above construction of the contract, we are clear that this work was no alteration or deviation from the contract within the meaning contended for by the surety.

[9] In connection with this point, there are involved two other matters: The manner in which this work was required to be done and the compensation to which Elkan is entitled therefor. It is contended that this concrete was ordered done by a "continuous pour," which made the work more expensive and also resulted, because of high waters, in considerable loss of material which was being assembled, and necessarily assembled, for this "continuous pour," and constituted a departure from the contract which would release the surety. The specifications are entirely silent as to the specific matter of the manner of concrete pouring in connection with the piers. However, we think the general and rather generous powers given by the specifications to the engineer over the contractor in the performance of the work cover such authority.

[10] As to the compensation, whether it should be made at the contract rate or at the "extras" rate, we have had some hesitation. The amount allowed and paid by the district was for the labor and material at the contract rate. This covered no compensation for replacing part of the cofferdam which had been withdrawn or for reinstatement and use of the pumps to empty the dam again for a portion of this work which had to be done under water line. These items were necessitated by the conditions of the work, they were caused by the act of the engineer in not discovering his own mistake concerning pier No. 2 and not informing Elkan before he had begun drawing the piling which formed the cofferdam at that point. This was work "in connec-

tion with this bridge" and therefore within the contract; but we cannot believe the parties intended that work of this kind resulting wholly from a mistake of the district engineer should go uncompensated. See Wood v. Ft. Wayne, 119 U. S. 312, 7 Sup. Ct. 219, 30 L. Ed. 416. We think compensation should be made therefor as "extras" and at the rate for extras provided in the contract. As to other claimed items, such as loss of material from high water, interference with progress of work on other parts of the bridge and some other lesser items, we think no recovery should be allowed. While the result is hard on the contractor and his surety yet that result follows logically the making of a contract which grants such extensive authority to the district and its engineers. The parties voluntarily incurred these obligations and we must construe and apply the contract as they made it. It is without our power or right to relieve them from onerous obligations which they voluntarily assumed and which have resulted disastrously to them.

### West Approach.

[11] The west approach to the bridge was to be made by a long earth fill. Both the district and Elkan construed the contract as including this approach. An employee of Elkan, one Jones, was discharged because he construed the contract otherwise and sought to procure, for himself, a contract to construct this approach. Elkan constructed quite a portion thereof and it was one of the most profitable parts of his entire construction. Elkan has never claimed that this approach was without the contract and the district has always and does now contend that it is within the contract. The surety company contends that it is not and that the doing of this work is such a departure from the contract as to entirely release it from all obligation on its bond. The contract, in paragraph 1, provides that the contractor "hereby agrees to build and fully complete in every respect the said reinforced concrete arch bridge and the *approaches* thereto, all in accordance with the plans and specifications hereto attached and made a part hereof." The plans show the west approach fully and there is one detail drawing thereof giving engineering stations, grade percentages and elevations. The specifications are curiously ambiguous, because they contain contradictory provisions respecting this approach. The engineer for the district explains the presence of this contradiction by saying that the bridge construction was submitted twice to bidders. The first time without result. The second time, Elkan submitted his bid and secured the award. As first submitted, this approach was excluded. It was included in the specifications on the second submission but certain portions of the old form of specifications referring to this matter were inadvertently left in. The pertinent parts of the specifications are as follows:

"Part I. b. General Description" contains the following:

"The approach on the Oklahoma side of the river will be constructed of earth, *but will not be included under this contract.*"

"Part VI. Approaches" sets out in detail the construction of the east approach, including paragraphs "a" and "b" relating to "Retaining

Wall" and "Earth Fill." Then follows paragraph "c. Pavement."
The first part of "c" describes, in detail, the pavement of the east
approach and is followed by:

"*The west approach is to be paved* with a 12-inch macadam pavement to
be put down in accordance with the directions of the engineer."

Under "List of Quantities," submitted to bidders, is the item follow-
ing:

"Earth or sand fill, *both approaches* .....................22,000 cu. yds."

Summing up these provisions the result is as follows: The con-
tract proper provides for building both approaches "in accordance with
the plans and specifications"; the plans provide for building both ap-
proaches; the bids were required for work on both approaches; the
specifications are contradictory, containing a direct statement that
the west approach is not included. Taking all of these together, a
doubt and ambiguity exists as to the intent of the parties. An evident
need for construction is presented. The language is susceptible of ei-
ther construction and one of the two meanings must have been intended.
As the language of the contract itself furnishes no solution, we must
go outside of the instrument for light. The circumstances surround-
ing the parties up to and at the time the contract was executed offer
no aid except the above provision in the submission of bids. That pro-
vision expressly invites the bidder to consider fills for "both ap-
proaches." The conduct of the parties after the contract was execut-
ed and in connection with performance is important. The sole purpose
of construction of a contract is to ascertain the intent of the parties.
Where the parties proceed in the performance of the contract as though
it had a certain meaning and that meaning is not entirely inconsistent
with the wording of the contract, it should prevail. Lowrey v. Hawaii,
206 U. S. 206, 222, 27 Sup. Ct. 622, 51 L. Ed. 1026; 6 R. C. L. 852;
13 C. J. 546. Here both parties, apparently without doubt or hesita-
tion as to the meaning of this contract, have proceeded to construct and
to pay for this approach as though such construction were within the
contract. The wording of the contract in that respect is ambiguous.
This practical construction by both parties must determine the mean-
ing of the contract. We hold that such is the construction to be placed
upon the contract.

A summary of our views, as above expressed, on the appeals of
Elkan and of the surety company are that the trial court was right
in holding Elkan and the surety company liable upon the contract and
bond as to all of the issues here presented except that the west ap-
proach should be included in the contract and that allowance should
be made, as extras, to Elkan for the expense in reconstructing the
cofferdam and for pumping expenses in connection with the last order
made by the engineer concerning construction at pier No. 2.

The cross-appeal of the district is upon two propositions: Inclusion
in the contract of the west approach; rendition of final decrees as to
amount of recovery before completion of the bridge. The first point
has been disposed of above. Determination of the second point is now
unnecessary in view of the necessity for remanding the case for other

reasons given above. By the terms of the contract which was made when Elkan stopped work, the bridge was to have been completed in August, 1921. It has doubtless been completed by this time, so that at the retrial on this remand evidence will be forthcoming as to the actual, instead of the estimated, loss of the district. That showing should be made.

The decree is modified as above set forth and the cause remanded for proceedings not inconsistent with the above opinion at the costs of the appellants and appellees, Elkan and the Fidelity & Deposit Company of Maryland.