**COMMISSIONERS OF SEWERAGE OF CITY OF LOUISVILLE, KY., v. DAVIS et al.**

**DAVIS et al. v. COMMISSIONERS OF SEWERAGE OF CITY OF LOUISVILLE, KY.**

Nos. 7411, 7412.

Circuit Court of Appeals, Sixth Circuit.

March 5, 1937.

Robert S. Marx, of Cincinnati, Ohio, and Rowan Hardin, of Louisville, Ky. (Rowan A. Hardin and Nichols, Morrill, Wood, Marx & Ginter, all of Cincinnati, Ohio, on the brief), for Commissioners of Sewerage.

Robert Lee Blackwell, of Louisville, Ky. (William Marshall Bullitt and Bruce & Bullitt, all of Louisville, Ky., on the brief), for A. A. Davis et al.

Before HICKS and SIMONS, Circuit Judges, and LEDERLE, District Judge.

HICKS, Circuit Judge.

On August 24, 1928, A. A. Davis and E. D. Davis, citizens and residents of Oklahoma City, and copartners doing business as A. A. Davis & Co. (herein called the Company), entered into a contract with the Commissioners of Sewerage of the City of Louisville (hereinafter called the Commission), for the construction of 8,544.54 linear feet of concrete sewer in open trench. The sewer, called the Highland Park-Beechmont Sewer, varied in size at different points but required the excavation of a trench roughly 18 feet wide and 15 to 25 feet deep, with a shallow trench 6 to 8 inches deep in the floor of a portion of it for an underdrain. The contract

called for its completion in 270 days, with a penalty of $25 per day for each day taken in excess thereof; 206 extra days were taken, although about 40 of these were allowed by the engineer on account of bad weather.

On or about July 1, 1928, the Commission advertised in trade journals that on July 20 it would receive bids or proposals for the construction of the sewer. The advertisement stated that the work would involve approximately "9,470 Lin. ft.— Earth Excavation in open trench. * * * Payment for earth excavation will be by the linear foot and cubic yard, concrete by the cubic yard and steel by the pound." The description of the project was contained in a printed book of nearly 200 pages, copies ·of which were used by the Commission for all its sewer jobs, of which it had many. Blanks were left in the books into which the separate specifications and figures for each job could be inserted by hand. Much of the printed material, of course, applied to all jobs, but inapplicable portions were crossed out with ink. This particular issue of the book bore on its cover, among other things, the notation that it applied to "Contract 40" and that it contained "Information for Bidders" and "Specifications for the Construction of Highland Park-Beechmont Sewer." On the sixth page under the heading "Drawings," and under the general heading "Information for Bidders," appeared this statement: "The location and the general character of the work to be done under this Contract are shown upon Drawings in the office of the Commission entitled Contract No. 40 * * * dated June 15, 1928, and numbered" (listing sixteen numbers) "which are to be a part of this contract."

On page 7, under the same general heading and under the specific heading "Quantities," this appeared:

"The following is an approximate statement of the engineer's estimate of the extent of the work required. * * *

"Item 1a. *Earth excavation and backfill* for 12′ 2″ x 7′ 9″ rectangular sewer from Sta. 1 plus 12.03 to Sta. 10 plus 24.34 —912.31 *linear feet.*" (Italics ours.)

Then followed five other items aggregating (exclusive of a section later left out of the contract by agreement) the linear feet of earth excavation and backfill upon which bids were asked. The quantities of concrete were set up in other items on a cubic yard basis and reinforcing steel on

a pound basis. In the second general section entitled "Proposals," the bidder was directed to quote prices on these same items of "earth excavation and backfill" at dollars and cents per linear foot and the concrete on the cubic yard basis and the iron on a pound basis. On page 95 under the general heading "Specifications" appeared the most disputed language in the contract:

"Earth Excavation
"Earth Defined.

"Section 1.1. The word 'earth,' when used in these Specifications, shall mean all kinds of materials including old masonry, excavated or which are to be excavated. except rock as hereinafter defined."

The line struck out was originally a part of the printed specifications but was crossed out with ink and a period placed in ink after the word "excavated."

On page 94, for instance, the word "rock" was struck out everywhere it appeared under the section "Payment Line." And elsewhere in the specifications all references to rock were scrupulously deleted by crossing out.

Prior to completion of the drawings and calling for bids, employees of the Commission made 19 borings along the line of the work. On account of street traffic only one of the borings was made on the center line of the sewer. The others ranged from 8 to 31 feet on one side or the other of the center line, and the exact location of each was indicated on the drawings. The borings were made with a sand or earth auger similar to a posthole digger type of auger, so that the samples of the material through which it passed could be brought up, noted, and preserved. All of these materials, such as cinders and gravel in filled ground, yellow clay, and various shades and consistencies of blue clay, etc., were recorded on the drawings, along with the thickness of each stratum thereof. Twelve of these borings were carried to subgrade or lower. Seven, namely, Nos. 8, 9, 10, 11, 12, 15, and 18, were stopped by a hard substance before reaching subgrade. These borings were stopped respectively at .2 feet, 5 feet, 7.2 feet, 2.8 feet, 2.2 feet, 4.5 feet, and 1.4 feet higher than subgrade. In each instance the auger, which with extensions weighed roughly 100 pounds, was smashed and churned against the obstructing material, so that small pieces were splintered off and brought to the surface. The samples from each hole were placed in separate fruit jars and were carefully

labeled to show the name of the project to which they were related, the number of the boring at which they were taken with the station, the depth at which they were encountered, and their nature (as "Yellow Clay"). In each instance where the boring did not penetrate to subgrade, the substance that stopped it was marked on the drawings as "shale" and the samples thereof placed in the jars were likewise so labeled.

The borings were made by a crew of men under the general supervision of Howard F. Stolz, junior engineer with the Commission. The samples obtained were then carried to the Commission's chemical laboratory and kept on display along with samples of borings from numerous other projects.

On July 7, R. O. Schriver, the Company's engineer and construction superintendent, was taken over the location of the sewer by a Mr. Boerner, construction engineer of the Commission, and later, on July 17, after receiving the specifications and drawings, he and A. A. Davis appeared at Louisville, went to the office of Mr. Caye, the chief engineer of the Commission, who prepared the specifications and contract, and asked to get all the information they could, at which time they were both taken over the job and a nearby one by Mr. Boerner. It is claimed by the Company that on this occasion Boerner made certain statements to Davis and Schriver which will be hereinafter referred to. At the close of this trip Davis and Schriver were taken to the laboratory and made an examination of the contents of the jars. The Company claimed that it was compelled in the execution of the work to excavate 7,-663.03 cubic yards of limestone and slate which required blasting, wedging, and sledging for its removal. Upon being denied compensation therefor it brought suit in equity against the Commission for approximately $215,000 as damages for alleged fraudulent deception whereby they claimed to have been misled in the execution of the contract. So far as is material here, the elements of the damages sought were: (1) The excess cost of excavating the limestone and slate upon the theory that such material was not contemplated or covered by the contract; and (2) the penalties exacted for exceeding the contract time which the Company claimed was due to the excavation of limestone and slate.

The court appointed a special master to take the testimony and report his conclusions of law and fact. He presided at the taking of the testimony, saw the witnesses on the stand, filed a detailed report, and found every issue of fact and law in favor of the Commission. Exceptions taken by the Company were framed to require a review by the District Court of all the evidence. The court sustained the exceptions and decreed a recovery totalling approximately $80,000. Both sides appealed.

The determinative question is, whether the Company was fraudulently misled by the Commission or its authorized agents into believing that there would be no material found in the excavation requiring blasting, wedging, or sledging for its economical removal. This of course is purely a question of fact. The Company urges that the Commission accomplished its deception by a deliberate "step by step" process; that the first step was the use of the term "earth excavation" in the advertisement; and the second was the use of the same words at various places in the contract; that the term earth excavation would naturally lead the contractor to believe that the job involved the removal of only ordinary earth, such as could be excavated with clam shell buckets or steam shovels, as distinguished from solid rock or slate, or at least that the term earth excavation as defined in the contract was so ambiguous in meaning as to be fraudulent in law.

The master held that the definition of the term was plain and its meaning was therefore not dependent upon extraneous construction. The court found that the definition "did cover rock," but concluded that the ambiguous nature of the language used therefore should be considered in determining whether the Company or its agents were misled into believing that blasting would not be encountered.

We find no ambiguity in the definition. The word "earth" has many commonly accepted meanings. It was dealt with here, however, in an excavation contract, and it was necessary therefore to define it to avoid misunderstanding. It was defined in simple language to mean "all kinds of materials, * * * excavated or which are to be excavated." As a further precaution against misinterpretation, the phrase "except rock as hereinafter defined" and all other references to rock in the printed specifications were meticulously expunged.

The contract clearly provided for payment upon a linear foot basis. There was no classification of materials. The linear

foot basis was particularly defined to be "the actual length in linear feet of sewer constructed. * * *" Under the heading "Underground Information, Objects and Structures" is section V as follows:

"Section V. The plots of pipes and other underground objects are supposed to be approximately correct, but should they be found to be otherwise, or should the Contractor encounter quicksand, springs, water, disintegrated rock, boulders, old masonry, sewers, drains, pipes, conduits or other underground objects or structures not shown on the Drawings, or should he encounter earth different from what is indicated by the borings and soundings as shown on the Drawings or should he encounter difficulties other than what was estimated or expected, he shall have no claim for any additional compensation on account of the underground information as shown on the Drawings not showing or representing underground objects or actual conditions as encountered or found, it being clearly understood and agreed that the Commission does not by implication or otherwise guarantee the borings, soundings or plots of underground objects to show or represent conditions which will be encountered in the execution of this Contract."

We think the meaning of the word "earth" as defined and used in the contract was plain and unambiguous, and that extraneous evidence was inadmissible to destroy that meaning, and the Company was bound unless it was induced to assume the obligation by misrepresentations of the Commission or its authorized agents that the work would not involve rock which would require blasting, wedging, or sledging for its removal.

■ On this issue Schriver testified that on the visit of July 17 Boerner took him and A. A. Davis to the Whitney avenue sewer job some blocks distant from the proposed sewer; that at that point they were then working in a kind of loam, clay, sand, and gravel, and that, upon being asked by them if it was the same kind of material they could expect on their job, Boerner answered that it was, saying that he had been working for the Commission 6 or 7 years and was pretty well acquainted with the territory or should be; and to the best of his knowledge there was no rock in that part of the country. Davis' testimony as to what Boerner said regarding the existence of rock in that part of the city confirmed Schriver in most particulars,

although in a place or two in his evidence Davis testified that Boerner said that "in his opinion" no rock could be found on the job. Davis "considered Mr. Boerner to be a man of experience along this particular line and this exact part of the country."

Boerner denied that he made any such representations, saying: "I made no statements to them with reference to the subsoil conditions that they would encounter in digging this excavation other than as shown on the contract drawings. I did not make to them any representation that no rock would be encountered in the excavation for this sewer. I did not have any knowledge on that subject at that time. I took them over to see another sewer excavation" (the Whitney Avenue job). They "had not then struck shale."

At another point he said that, when he was asked about rock, he referred to the blueprints, saying that it showed much rock.

Caye, of course, did not know what was said on this inspection trip, but stated that his instructions to Boerner on such occasions had been "to take the contractors over the work, show them the streets in which the sewer was to be constructed and that was all. * * * I have discussed with him that matter, and cautioned him to be very careful about even expressing an opinion regarding the work." Boerner agreed that he had been so instructed.

The master found that Boerner "probably did make some comment of the nature testified to by Mr. Davis and Mr. Schriver as an expression of opinion which he honestly entertained," but "it is hardly reasonable to suppose that in so important a matter, the plaintiffs could have relied for their protection upon a casual conversation of this kind with one of the employees of the Commission, who accompanied them rather in the nature of a guide. * * *"

■ In addition, if we assume that Boerner had authority to speak for the Commission (whether he did is left in doubt), the master specifically found that no misrepresentation was made by Boerner. This finding was presumptively correct. Atherton v. Anderson, 86 F.(2d) 518, 522 (C. C.A.6), was not modified or rejected by the court and we see no reason to interfere with it. As was said in Atherton v. Anderson, supra, the master saw and heard the witnesses and had a superior opportunity to test their credibility and reconcile the conflicts in their testimony.

■ It is next urged that the borings and the labels on the blueprints were deceptive and misleading, in that they caused the Company to believe that no slate or limestone, which would of course require blasting, would be encountered, and that this was the next step by which the Commission accomplished its deception. The master found against the Company upon this issue. As stated, the samples taken from the borings which did not reach subgrade were called "shale" on the jars in which they were placed and the obstructing material was labeled "shale" on the blueprints. The master found that this classification was correct and the court concurred. It said: "The proof, however, shows that the substance encountered was in fact shale, and that there is no slate in the vicinity of Louisville, Ky."

There is no controversy over this particular finding, but the contention arose over what is meant by the term "shale." Davis and Schriver claim that they understood what the Commission's engineer denoted as "shale" was a soft rock overlying beds of what they called "slate," and that the samples contained in the seven jars taken from the borings indicated on the drawings to have been stopped by shale signified to them shale in the sense in which they understood the term; that is, a very soft easily removable rock which verged on the clays in consistency. They said that none of these samples contained specimens of the rock they later actually encountered close to these borings. Schriver was a competent engineer and Davis was a capable contractor.

This raises the question whether they were fraudulently misled by false labels and borings or whether there was an honest misunderstanding between the parties of the meaning of the words "shale" and "slate." Upon this issue both sides introduced impeccable witnesses. G. R. Smiley, assistant chief engineer for the Louisville & Nashville Railroad, testified for the Company that "the words 'slate' and 'shale' do not have a real definite, well defined meaning among people engaged in such excavation work in this section of Kentucky." He called Exhibits ("G," "L," and "S,") samples of rock taken out by the Company, "black slate" and limestone, and said on cross-examination that geologically the first would probably be called "shale." He identified the materials from borings 8, 9, and 10 as "hard shale" or "black slate."

George M. Eady, a Louisville contractor, and a witness for the Company, in examining the samples of rock passed on by Smiley, said that he didn't know what contractors called it, but he called it "slate." "Shale," he said, "is generally a brownish, grayish material, more brown than gray. * * *"

Caye testified that after seeing the actual excavation, and comparing it with the plans, he was of the opinion that the conditions actually encountered were very closely portrayed by the borings. He said that shale is not only scientifically classed as rock, but it is understood among contractors and engineers that shale is something of rock character that requires drilling and blasting; and that shale is considered as being a rock of considerable hardness. He explained that the difference between slate and shale was distinctively characterized by their geological formation; that he checked the contents of the jars to see that they were properly labeled as to classification.

In addition to Caye's testimony on the point, the Commission offered the testimony of several other well qualified witnesses. Lucien Beckner, a professional consulting geologist residing in Louisville, in examining the samples submitted to Smiley, said, that is what "we call New Albany shale," a "black shale." He identified the other rock shown Smiley as limestone and said that it was always found under shale in that section. He said "there are no slates in Kentucky," but these materials are "usually called slate by the natives"; it is known as slate only by people "who do not know the difference." He said that shale "has been completely distinguished from slate except in common parlance," that "you could not sell shale anywhere in the United States for slate." He was one of those who was of the opinion that the auger used could remove samples of black shale.

Charles E. Cannell, a general contractor for 38 years, who had done sewer work in Louisville, identified all the samples from the disputed borings as shale, and called the exhibits submitted to Smiley as shale rock and limestone.

Homan J. Scott, a contractor of 15 years' experience, identified all the boring samples as shale except No. 18, which he said looked like hardpan with perhaps some shale in it. He identified Exhibits "G," "L," and "S" as shale and limestone.

James B. Wilson of Louisville, a civil engineer for 30 years, said that shale is very common in Jefferson county, Ky. He identified all the disputed samples in the jars as shale and agreed with Cannell's classification of the rocks submitted to Smiley. He said of the materials in the jars, "The material is shale; I don't know of any other thing to call it; it is shale."

Frank L. Longley, a contractor from Lexington, Ky., confirmed the examinations of previous witnesses for the Commission as to the borings in the seven jars, and the "Smiley" rocks. He would not say that these latter were exactly the same "in analysis" as the material in the jars, "but from a practical contractor's standpoint I would say it is the same material; near enough the same kind of material that it would not make any difference to a contractor." He said that he also bid on the Highland Park-Beechmont Sewer job, examined the disputed boring samples at the time, and that they were sufficient to inform him that the material from which they came would require blasting for removal.

■ Upon consideration of this testimony, the master concluded that there was no fraud in connection with the samples or in the use of the word "shale" upon the jars or in the blueprints and specifications. We concur. The utmost that may be said is that there was a mutual misunderstanding as to the meaning of the word "shale." Whether this misunderstanding would justify a reformation of the contract we need not determine. It is sufficient to say that it does not support an action for deceit. The evidence does not justify a conclusion that the Company utilized this misunderstanding or confusion to perpetrate a fraud. We think the court misunderstood the effect of it.

■ The court inferred that the Commission did not disclose all it knew as to the subsoil conditions along the line of the sewer; that it should have apprehended from past experience that the contractor would likely encounter a substance that would require blasting, wedging, or sledging, and that its failure to so specifically advise the contractor, who was unacquainted with the local situation, of such conditions, was an affirmative fraud. We cannot concur in this view. There is no substantial evidence that the Commission or its authorized agents knew more about the subsoil conditions along the line of the sewer than were disclosed in the borings

and blueprints. This is self-evident because the conditions were hidden. See Elkan v. Sebastian Bridge Dist., 291 F. 532, 537 (C.C.A.8). Moreover, the Commission's expert witnesses Beckner, geologist, Wilson, engineer, Cannell, Scott, and Longley, contractors, and Caye and Boerner, all described the samples in the jars as a hard material that would probably require blasting. The master accepted this testimony as true, and we find no reason to reject it.

At the trial jar No. 9 actually contained large chunks of rock which were admittedly hard slate. When confronted with this jar, Davis and Schriver intimated that it had been tampered with since their original examination of it. There is no evidence to support this suggestion, and the master found upon substantial evidence that the auger was capable of bringing up samples of the size found in jar 9.

The Company, contrary to the findings of the master, insists that the Commission withheld material information which was known to it. This information was that Boerner, in charge of the borings, ascertained from the sounding of the auger tool, the churning of it in the hole, the feel of it in the hand, that the auger had struck material that would require blasting. But, assuming that the Commission was bound by this opinion of Boerner, it indicated, after all, nothing more than the "plat and profile" clearly disclosed.

Finally, we cannot escape the conclusion that a careful contractor could not have overlooked the warning on the blueprints that at different places the auger had been stopped by something too hard to penetrate.

■ There is little in the whole record that carries much weight on the accusation of fraud and deceit. Such accusations cannot be established by suggestions and presumptions. It is essential that the evidence be cogent, unequivocal, and convincing and leave the mind well satisfied that the allegations are true. Equitable Life Assurance Society v. Johnson, 81 F.(2d) 543, 547 (C.C.A.6). Rather than indicating fraud, the Commission's documents, drawings, and physical recordings strike us with the scrupulous care with which they were drawn and assembled.

We are not impressed with the oral testimony to the effect that the Commission by an unsigned paper included in a letter from its engineer to the Company made any representations as to soil condi-

tions not already included in the specifications and drawings. The evidence is particularly weak since the paper could not be found.

Nor are we impressed by evidence of the response to overtures made to the Commission after they had encountered rock. These overtures were entertained, but there is no satisfactory evidence that any concessions were granted.

The recovery embraces one item of $2,586.79 admitted to be due. For this item the decree is affirmed. In all other respects the decree is reversed and the case remanded, with directions to dismiss the bill at the cost of the Company.